POLEN, State Overseer of the Church of God *v.*
**COX**

[No. 362, September Term, 1969.]

*Decided July 10, 1970.*

26

The cause was argued before HAMMOND, C. J., and MC-WILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*Gerald A. Smith* and *I. Winston Mezger,* with whom were *Howard, Brown & Williams, Mezger & Mezger,* and *Carl A. Muly* on the brief, for appellant.

*William H. Adkins, II,* with whom were *W. Thomas Fountain* and *Henry, Henry & Adkins* on the brief, for appellee.

FINAN, J., delivered the opinion of the Court.

This case is before us on appeal from an order of the Circuit Court for Dorchester County dismissing appellant's bill of complaint for injunctive relief. The factual background of this case must be examined at some length. The Church of God is an unincorporated religious denomination with national headquarters in Cleveland, Tennessee. Prior to 1966, it was the practice of the Church of God to maintain separate white and colored branches within the church structure. The administrative headquarters of the colored branch was located in Jacksonville, Florida. A consequence of this separation was that there were two sets of regional or state directors (known in Church of God parlance as Overseers) for the white and colored branches respectively. The appellee, the Reverend Mr. J. B. Cox, was the State Overseer of the Colored Division of the Church of God for the State of Maryland as well as the minister of the colored congregation of the Church of God, located at 815 Center Street, Cambridge, Maryland.

In 1964 at the General Assembly of the Church of God, it was resolved that there should be no further reference to race within the church structure. This resolution was

28

implemented in August, 1966, by the merger of the white and colored branches of the Church of God. One effect of this merger was that the position of colored overseer for specific regions was no longer necessary. Thus the appellee was relegated to his local ministry when the Church of God appointed another to the position of Overseer for the Maryland, Delaware and District of Columbia region.

The dispute in the present case arises from events which transpired at a meeting held in the Cambridge Church on February 22, 1967. The appellee served as moderator of the meeting. The purpose of the gathering was to have the trustees of the congregation lease the property to the pastor and the congregation. The Minutes disclose that the following action was taken:

"(2) Moved and favored authority be invested in the hands of the Colored Congregation of the Church of God in the City of Cambridge to lease to the pastor and colored congregation the parsonage and church chapel for five years at an annual nominal fee of one dollar renewable for an additional five years at the option of the pastor and church congregation. The said property to be used for divine worship and religious purposes (carried by a vote of 18-2)."

Thereafter on February 24, 1967, the trustees leased to the appellee the property at 815 Center Street for a period of five years at an annual rental of one dollar. Part of the lease which was recorded among the land records of Dorchester County provided:

"(1) That the hereindescribed property will be used by the said Jeremiah B. Cox and the local congregation of said Church for divine worship and religious purposes only."

On April 1, 1967, the appellee and four others formed a religious corporation known as the National Church of God, Inc. This body presently holds its services in the church on the disputed property. The ministry of the ap-

pellee in the Church of God was officially revoked in September, 1967.

The bill of complaint for injunctive relief was filed by Thomas W. Day who had been appointed Overseer of the Maryland, Delaware, and District of Columbia region when the merger took place. When Mr. Day died, the lower court allowed the new Overseer and present appellant, O. W. Polen, to be substituted as party plaintiff. The bill of complaint sought to end the appellee's use and control of the leased property and of certain funds which were on deposit in the National Bank of Cambridge. The complaint charged that: (1) the meeting at which the trustees were authorized to lease the property was never properly convened since such a meeting could not be called without the permission of the Overseer; (2) the vote of 18-2 was not properly taken because those opposed were asked to stand and anyone who did not stand was considered as in favor of the authorization; (3) the proper trustees of the congregation did not sign the lease; (4) the terms of the deed by which the trustees held the property did not give them power to make this lease.

After a hearing the chancellor dismissed the bill. He concluded that the Supreme Court's decision in *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Church*, 393 U. S. 440 (1969) and our own decision in *The Maryland and Virginia Eldership of the Churches of God et al v. The Church of God at Sharpsburg, Inc.*, 249 Md. 650 (1968), preclude the intervention of a civil court in deciding this property dispute. Thus he stated: "While strictly speaking the question involves property rights, it certainly would appear that the controversy arises from a dispute over doctrine and practice within the church assignment of its clergy. It seems to me that if this court intervened here it would certainly be attempting to provide discipline and control of a denomination over its clergy and to maintain that denomination's 'purity of doctrine' which was condemned in Sharpsburg." The learned chancellor went on to note, however, that if the controversy involved only a neutral

principle of law, he would still conclude that the appellee should have control of the property. From his examination of the deed and other relevant church documents, the chancellor found that the national church had power over the local property only if the local church ceased to function or exist as distinguished from withdrawing from the national church. Thus on the authority of *Sharpsburg* which he thought analogous, the chancellor concluded the local church should keep control of the property since it had withdrawn. We think the chancellor erred in both of these conclusions.

I

The legal standard which the chancellor adopted to determine that the court had no jurisdiction to intervene in this dispute is founded upon an erroneous interpretation of the *Presbyterian* and *Sharpsburg* cases. These cases do not hold that the source of the controversy — that is whether the property dispute is motivated by a controversy over doctrinal practices—is determinative of whether the civil courts can intervene to decide church property disputes. To so hold would too narrowly restrict the scope of the court's jurisdiction. The relevant inquiry must be whether the court can resolve the property dispute on the basis of neutral principles of law which do not involve the resolution *by the court* of ecclesiastical issues. Thus in the present case, it does seem that the underlying source of the controversy stems from the mother church's assignment of clergy to the position of overseer and the decision to abolish the bifurcated church structure. However, as long as the court does not have to resolve the doctrinal propriety of these changes in order to determine who has legal control of the property, there is no unconstitutional intervention by the state in church affairs. Mr. Justice Brennan stated the limits of judicial intervention in the following terms in *Presbyterian*:

"It is obvious however, that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the

First Amendment. Civil courts do not inhibit the free exercise of religion merely by opening their doors to disputes involving church property. And there are neutral principles of law, developed for use in all property disputes which can be applied without 'establishing' churches to which property is awarded. But First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice. If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern." 393 U. S. at 449.

The type of controversies in which the courts cannot intervene is made clear by an examination of the situation before the Supreme Court in *Presbyterian.* Two Georgia churches which were affiliated with the Presbyterian Church in the United States voted to withdraw from the national body and form their own autonomous organizations. They did this in the belief that certain actions of the national church were in violation of that organization's constitution and were departures from the doctrine and practice in force at the time they had affiliated with the national church. The national church acknowledged the withdrawal and proceeded to take over the local property until new leadership could be appointed. The two local churches filed suit in the Georgia state courts to prevent trespass by the national church. The case was submitted to the jury on the theory that Georgia law implies a trust upon local property for the benefit of the national church upon condition that the national church adhere to its doctrine as it existed at the time of affiliation by the local churches. The jury found that the national body had substantially departed from the doctrine which was in existence at the time of affiliation.

32

The Supreme Court found this departure-from-doctrine test unconstitutional because it required civil courts to determine which doctrines were fundamental to church beliefs and whether substantial departures from such fundamental doctrines had occurred. Since the departure-from-doctrine aspect of the implied trust theory required this judicial resolution of doctrinal matters in order to decide who had legal right to the property, the state courts were forbidden from using this standard to resolve the property dispute.

It seems clear that the dispute in the *Presbyterian* case had as its underlying source a sharp difference between the litigants as to church doctrine and practice. However, it was not this factor with which the Supreme Court found fault. As noted above, the objectionable feature was that in order to solve the property questions the court had to resolve matters of doctrinal dispute.

Applying this analysis to the facts before us, it can be seen that the "source of the controversy" standard used by the chancellor was incorrect. The standard must be whether the parties by the acts and documents which have governed their relationship have made it possible for a civil court to resolve control of property without the court itself having to make ecclesiastical determinations. This we think was the message of *Presbyterian* when it stated: "Hence States, religious organizations, and individuals must structure relationships involving church property so as not to require the civil courts to resolve ecclesiastical questions." 393 U. S. at 449.

II

In considering the relationship between the Church of God and the colored congregation as it might bear on the resolution of this property dispute, we think the following portion of Judge Barnes' opinion in *Sharpsburg* will help to focus the inquiry:

"In considering questions in regard to the use of church property it is usually important in absence of express language in the deed convey-

ing the property or making the gift to consider the polity or form of church government which the particular denomination has. In the note in 75 Har. L. Rev. at pp. 1143-4, the three general types of church polity are defined as follows:

'At least three kinds of internal structure or polity may be discerned; congregational, presbyterial, and episcopal. In the congregational form each local congregation is self-governing. The presbyterial polities are representative authority being expressed by laymen and ministers in an ascending succession of judicatories—presbytery over the session of the local church, synod over presbytery, and general assembly over all. In the episcopal form power reposes in the clerical superiors such as bishops. Roughly presbyterial and episcopal polities may be considered hierarchical as opposed to congregational polities in which the autonomy of the local congregation is the central principle.'

"In many of the hierarchical churches there may be provisions in their constitutions, canon law, or other controlling documents or statutues which make it clear that the property is held in trust for the uses of the parent church and its discipline and appointments * * * It thus appears that there are three methods by which a hierarchical denomination may maintain control of local church property:

(1) It may require reverter clauses in the deed to the property of the local churches.

(2) It may provide in its constitution or by some authoritative source for the reverting of the local church property to the hierarchical body upon withdrawal by a local congregation with an implied consent by the local church to this provision.

(3) It may obtain from the General Assembly

34

an act providing for such a result." 249 Md. at
662, 663.

An examination of the relevant documents reveal that
the Church of God is essentially a presbyterial hierarchi-
cal body. The Minutes of the General Assembly of the
Church of God contain the basic governing and doctrinal
positions of the Church. All the Minutes have been passed
by a majority vote of those males of 21 years of age or
over who were present. Any male member of 21, white
or black, is entitled to vote. The role of the General As-
sembly is described in the Minutes as that "organized
body with full power and authority to designate the teach-
ing, government, principles, and practices of all the local
churches composing said assembly."

The relationship of the local churches to the mother
church is defined in this manner in the Minutes:

"The local churches, the names of which are
recorded, are the result of the faithful services
of the ministers and representatives of the Gen-
eral Assembly and these churches, when thus
received by the representatives of the General
Assembly, then became and composed a part of
the General Assembly. Therefore the right of
any local church as a whole to withdraw from
the General Assembly is not recognized and does
not exist but those members who prove disloyal
to the government and teachings as promul-
gated from time to time by the General Assem-
bly, or who are otherwise disorderly are to be
dealt with as individuals."

We think this establishes clearly the hierarchical nature
of the Church of God as autonomy of the local churches
is virtually non-existent.

Given the hierarchical nature of the Church of God,
what provisions have been made by the General Assembly
to control the passage of property upon the withdrawal
of a local congregation? The Minutes provide:

"Each local church or congregation that owns any real estate * * * shall appoint a local board of trustees, to consist of not less than three members, said board to be selected by the local congregation in a business meeting.

The said local board shall have full right, power and authority to buy property for the use or benefit of the local congregation; sell, exchange, transfer and convey any of the local property held by them, or to borrow money and pledge the said property for the repayment of the same, and to execute all necessary deeds, conveyances, provided that the proposition shall first be presented to a regular or called conference of the local church presided over by the state overseer, or one whom he may appoint, and the said project shall be approved by a two-third majority vote.

If any local church shall cease to function or exist, then the local board of trustees shall hold the local property as trustees for the Church of God generally in the state where located, and said local board shall convey the local property to the state board to be used and disposed of by it for the use and benefit of the church in that state generally; * * *

However in the event the majority or all of the local church depart from the faith or decide to discontinue fellowship with the organization, the state overseer shall have power to appoint other trustees to hold the property for the Church of God."

These provisions cover the disposition of property not only when the local church has ceased to function or exist but also when the majority decides "to discontinue fellowship with the organization." In his opinion the chancellor analogized the present case to the situation in *Sharpsburg* and concluded that since the local church had

not ceased to function or exist, it was entitled to the property. However, in *Sharpsburg*, the national church made no provision for the disposition or control of the property in case of withdrawal.[1] In the case at bar we think the Church of God clearly has made a determination that when a majority of a local church discontinues fellowship with the national church, the property does not follow. This is an example of a hierarchical church providing, "in its constitution or by some authoritative source for the reverting of the local church property to the hierarchical body upon withdrawal by a local congregation with an implied consent by the local church to this provision." *Sharpsburg*, 249 Md. 663.

This Court then must determine two issues before the property can be awarded to one litigant or the other. The first is whether implied consent to these provisions of the Minutes can be inferred from the relationship between the mother church and the colored congregation of the Church of God at Cambridge. The second is whether the lease was beyond the power of the trustees to execute.

At the hearing before the Chancellor there was some dispute as to whether prior to 1966, the year in which reference to race within the church structure was abolished, the colored churches were a distinct and separate body from the white or were only administered separately. The contention of the appellee is that since they constituted a separate body from the whites, the individual approval of each congregation would be necessary before a merger could be effected. This, however, is not the issue which the court must decide. The issue is whether the colored congregation had adopted the Minutes of the General Assembly. The overwhelming evidence is that they had. The Reverend Mr. Cox was listed as an ordained minister of the Church of God through 1966. The Minutes also list him as the Colored Overseer for the State

---

1. It should be noted that the mother Church of God in the instant case is not the same ecclesiastical body as The Maryland and Virginia Eldership of the Churches of God, a Maryland corporation which was the party plaintiff in Md. & Va. Eldership v. Sharpsburg, 249 Md. 650 (1968) and 254 Md. 162 (1969).

of Maryland. The Reverend Mr. Cox did not deny the validity of these records. The Minutes list the colored congregation at Cambridge, Maryland, as a Church of God in their section under Colored Churches. The record also reveals that blacks were allowed to attend and vote upon any matters before the General Assembly and that Reverend Mr. Cox himself attended such assemblies. There was no evidence introduced which indicated doctrinal differences between the mother church and the colored congregation or which would indicate that the practices of the colored congregation were inconsistent with provisions of the Minutes.

Certainly when deciding to affiliate with the Church of God, the colored congregation may have placed a great deal of value on the segregated church structure with a black district overseer directly superior to them. However, by agreeing to be bound by the Minutes, it should have been apparent that a majority vote at the General Assembly level might change any doctrinal or governmental practice and that if such change was so unpalatable as to cause withdrawal, the property would revert to the control of the national body. It would of course be a different matter if at the time they affiliated, the Minutes had provided for retention of the property by the local church upon withdrawal, and then the General Assembly changed the Minutes to provide the opposite. If upon the change in the Minutes, the Church withdrew, then implied consent to the change would not be possible. However, this was not the situation in the present case. Without any indications that the local congregation did not consider themselves bound by the Minutes, we think an implied consent to the withdrawal provisions must be inferred.

Nor do we here have a situation such as existed in the Sharpsburg cases wherein the local Churches of God (Sharpsburg and Indian Springs) had taken advantage of the General Religious Corporation Law of Maryland, now Code (1966 Repl. Vol.) Article 23, Sections 256-70, and had both become incorporated congregations. At least

38

in the case of the Charter of the Indian Springs Church the corporation had provided, not only for its own autonomy, but specifically that its affiliation with a church denomination "shall in nowise affect this Corporation in its ownership and control of its real and personal property which shall be and remain in the properly constituted officers of this Corporation." However, as we have stated previously, the *Sharpsburg* cases turned on the pivotal fact that the mother church failed to provide any rule or regulation regarding the disposition and control of local church property upon a withdrawal of the local congregation from the mother church. However, in the instant case the congregation of the local church once having impliedly consented to be bound by the Minutes of the mother church, cannot ignore the consequences attendant to withdrawing from that national body.

This then leads us to a consideration of the second issue. Was the lease beyond the power of the local trustees to execute? The habendum clause in the deed under which the trustees held the property, reads as follows:

"To Have And To Hold the said lot or parcel of land, together with the buildings and improvements thereon unto the above named Trustees, their successors and assigns in trust forever, subject alone to the following limitations: the said Board of Trustees, and successors in office hold title to, manage and control the said lot or parcel of land together with buildings and improvements thereon for the general use and benefit of the colored congregation of the Church of God at Cambridge, Dorchester County, State of Maryland. The said Board of Trustees shall have full right, power and authority to sell, exchange, transfer, and convey said lot or parcel of land, together with the buildings and improvements, thereon or to borrow money and pledge the same for the re-payment thereof and to execute all necessary deeds, conveyances, mortgages, etc., providing the prop-

osition shall first be presented to a regular or called conference of the said Church at Cambridge, Dorchester County, Maryland, presided over by the Minister in Charge of the congregation of the Church of God at Cambridge, Maryland, and the said project approved by two-thirds of all the members of the said local congregation present and voting * * *."

These powers are generally consistent with those provided for in the Minutes for local trustees, as we have previously set forth in this opinion. Certainly the power to lease falls within the power to sell, exchange, transfer, or convey.

The motivation for obtaining the lease was made quite clear by the Reverend Mr. Cox on cross-examination.

"Q. And isn't it a fact that even in 1967 that you felt that you were still affiliated with the Church of God in Cleveland, Tennessee?

A. No, sir, I didn't.

Q. Why did you find it necessary sir, if you felt that you weren't affiliated, why did you find it necessary to have a meeting to vote on the merger, as you testified, on February 12th, 1967?

A. Because I learned from a fellow minister that the group in Cleveland, Tennessee, wouldn't act right—I am trying to find a nice word to put in there—and they would come and get the sheriff and push me out. And that is the reason of getting the lease, yes, sir.

Q. It was a reason?

A. That was my reasoning for getting the lease, that they couldn't come and push me out when the majority of the folks say didn't want to go along with the merger."

This testimony compels the conclusion that being in disagreement with the merger, the lease served as a vehicle by which the withdrawing congregation removed the

40

local property from the mother church. The trustees who signed the lease were well aware of this purpose. Reading their powers under the deed in conjunction with their power as trustees as defined in the Minutes, we can only conclude that once it was clear that a majority of the local church was going to discontinue fellowship with the Church of God, the lease of the property was beyond their power because it was not for the general use and benefit of the Church of God of Cambridge, Maryland.[2]

We are of the opinion that the order of the chancellor should be reversed and the cause remanded for the passage of a decree in conformity with this opinion regarding the ownership of the church property at No. 815 Center Street, Cambridge, Maryland, whereby, the State Overseer of the Church of God, with General Executive Offices in Cleveland, Tennessee, shall appoint trustees to hold the property for the Church of God, and for the taking of such additional testimony as may be necessary to determine the source and ownership of the funds in the National Bank of Cambridge, and further, that pending this determination the appellee shall be enjoined from withdrawing or disposing of these funds.

> *Order reversed and cause remanded for the passage of a decree in conformity with this opinion, appellee to pay costs.*

---

2. In view of this determination it becomes unnecessary to reach the question of whether the meeting of the congregation of the local church to authorize the trustees to execute the lease was properly called and conducted.