G. Marion SMITH and Arthur E. Eakin, President and Secretary of the Executive Committee of the General Eldership of the Churches of God in North America, Individually and as such officers and representatives of the members of said denomination

v.

The CHURCH OF GOD AT LOCUST VALLEY BETHEL OF FREDERICK COUNTY, MARYLAND, a corporation, and Eugene Burge, Individually.

G. Marion SMITH and Arthur E. Eakin, President and Secretary of the Executive Committee of the General Eldership of the Churches of God in North America, Individually and as such officers and representatives of the members of said denomination

v.

FIRST CHURCH OF GOD, OF KNOXVILLE, FREDERICK COUNTY, MARYLAND, and Ralph Jamison, Individually.

Civ. Nos. 20511, 20702.

United States District Court,
D. Maryland.
Jan. 20, 1971.

Charles O. Fisher, Westminster, Md., Alfred L. Scanlan, Washington, D. C.,

and James H. Booser, Harrisburg, Pa., for plaintiffs.

Marvin M. Polikoff, Baltimore, Md., and Omer T. Kaylor, Jr., Hagerstown, Md., for defendants.

FRANK A. KAUFMAN, District Judge.

Plaintiffs in these two cases,[1] Dr. G. Marion Smith and Dr. Arthur E. Eakin, are citizens of Pennsylvania and are, respectively, the President and Secretary of the Executive Committee of the General Eldership of the Churches of God in North America. In one of the cases, the defendants are The Church of God at Locust Valley (Locust Valley), a Maryland corporation, and Eugene Burge, its pastor and a citizen of Maryland.[2] In the other case, the defendants are First Church of God of Knoxville (Knoxville), a Maryland corporation, and Ralph Jamison, its pastor and a citizen of Maryland. Both defendant churches have been incorporated under the General Religious Corporation Law of Maryland (now Maryland Code (1957), art. 23, §§ 256 to 270), Locust Valley on January 29, 1907, and Knoxville on July 5, 1940. The amounts in controversy in both cases exceed $10,000. Diversity jurisdiction is accordingly present. The facts have been stipulated. Maryland law governs and applies. 28 U.S.C. § 1652. See Erie Railroad Company v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

The Churches of God in North America is a religious denomination organized in 1845 by John Winebrenner. The General Eldership is the highest governing body of that denomination and was incorporated in Pennsylvania in 1867. The Maryland and Virginia Eldership, organized in 1872, is one of the subordinate bodies which make up the General Eldership and is the intermediate denominational governing body with which both defendant churches were affiliated prior to 1966.

1. These cases, with the consent of the parties, have been consolidated for hearing and disposition because of the similarity of the issues involved.

2. Defendant Burge left the local church on December 7, 1969. That pulpit is now being occupied by Curbin B. Stambaugh, a citizen of Maryland.

On or about June 26, 1966, the two defendant churches held duly called meetings of their respective congregations at which substantial majorities of each church voted to withdraw from the Maryland and Virginia Eldership. Thereafter, the Maryland and Virginia Eldership revoked the ordination certificates of the individual defendant pastors and expelled from the local congregations all persons who had participated in the withdrawal from the Eldership. Since then, a majority of the members of the two congregations and the two defendant pastors have rebuffed the attempts of the Maryland and Virginia Eldership to send ministers accredited by that Eldership to the seceding local churches and have refused to relinquish the use and control of the local church properties. The right to the control and use of those properties is the subject of the within litigation.

Similar if not almost identical issues have been litigated and determined in Maryland and Virginia Eldership of The Churches of God v. The Church of God at Sharpsburg, 249 Md. 650, 241 A.2d 691 (1968), vacated and remanded, 393 U.S. 528, 89 S.Ct. 850, 21 L.Ed.2d 750 (1969), reaffirmed, 254 Md. 162, 254 A.2d 162 (1969), appeal dismissed, 396 U.S. 367, 90 S.Ct. 499, 24 L.Ed.2d 582 (1970), involving different local churches and their respective church properties and certain events which apparently transpired simultaneously with the events which underlie the disputes in these cases.[3] In *Sharpsburg*, the Maryland and Virginia Eldership instituted an action against two separate local member churches, incorporated under the Maryland General Religious Corporation Law, to determine the right to ownership and control of the local church properties upon the withdrawal, in June, 1966, of the local churches from the denomination. The Court of Appeals of Maryland gave judgment in favor of the defendants—the secessionist local churches. Judge Barnes, speaking for the Court, after analyzing the Maryland General Religious Corporation Law, and noting (at 657, 241 A.2d at 696)[4] that "[s]everal denominations have specific provisions in Article 23 in regard to their organization and the holding of property,"[5] wrote (at 658, 241 A.2d at 696):

It is clear that when a congregation is incorporated under the General Religious Law applicable to *all* religious groups, the trustees and the local congregation own and control *the property* of the local church. There is no provision in the General Religious Law that the local congregation conform to or follow any particular religious tenet or doctrine and it is apparent that it would be inappropriate for the General Assembly to have made such a provision. In short, the General Religious Law is concerned with the own-

3. *See also* Polen v. Cox, 259 Md. 25, 267 A.2d 201 (1970), which relied upon and applied *Sharpsburg, supra,* in resolving a local church property dispute within another denomination.

4. All page references are to the first opinion in *Sharpsburg* (249 Md. 650, 241 A. 2d 691) unless otherwise indicated.

5. * * * The Roman Catholic Church has provisions in Sections 271 to 274 for the incorporation of its parishes, the ordinary (the Archbishop), the vicar-general and the pastor of the congregation together with those persons appointed by the ordinary, are designated as incorporators. Sections 275 to 297 relate to the Protestant Episcopal Church in the Diocese of Maryland and are basically the provisions of the original Vestry Act, i. e., Act of 1798, chapter 24.[1] Sections 298 to 312 contain the provisions of a new act relating to the Protestant Episcopal Church in the Diocese of Easton (consisting of the nine Eastern Shore counties of Maryland), but this Act is not applicable in the Diocese of Maryland. Section 313 relates to the formation of corporations of the Methodist Church and Section 314 provides for the formation of corporations of the Presbyterian Church in the United States.

1. Separate congregations may, however, be incorporated under the General Religious Law and become affiliated with the Protestant Episcopal Church even though they have not been originally incorporated under the Vestry Act itself. * * * [at 657]

ership, use and disposition *of property*, not with any religious theories, doctrines or tenets. So far as the Maryland statutory law is concerned, there seems little doubt that the trustees and congregations of the local churches are entitled to own, use and control the property of the respective corporations. [Emphasis in original.]

In *Sharpsburg* (at 663, 241 A.2d at 699), Judge Barnes held that a hierarchial church[6] may maintain control of local church property in three ways:

1. It may require reverter clauses in the deeds to the property of the local churches.

2. It may provide in its constitution or by some other authoritative source for the reverting of the local church property to the hierarchical body upon withdrawal by a local congregation with an implied consent by the local church to this provision.

3. It may obtain from the General Assembly an act providing for such a result.

As we will later consider, the Church of God did not use any of these three possible means to obtain control of local church property.

After analyzing the *corporate documents* and constitutions of each of the groups involved in *Sharpsburg*, Judge Barnes held that while the internal structure or polity of the Church of God exhibited certain presbyterial characteristics, the organization of the denomination with respect to the right to use and control property of the local churches followed a congregational polity. Turning to the deeds involved in *Sharpsburg*, Judge Barnes wrote (at 665, 241 A.2d at 700):

Nor do the deeds for the properties of the local churches provide for their reverting to the Md. & Va. Eldership if the congregation withdraws from that Eldership. The deed to the Sharpsburg church recites in the habendum clause that it is held by the trustees and their successors "in trust for the use of the congregation of the Church of God at Sharpsburg, Maryland," and—

" * * * in the event the congregation of the Church of God at Sharpsburg, Maryland, *ceases to function as a church organization,* then all right, title and interest in the hereinabove described property shall immediately vest in the Maryland and Virginia Eldership of the Churches of God in North America, a body corporate, its successors or assigns." (Emphasis supplied.)

One of the Indian Springs deeds has a provision that if the church should *become extinct or cease to be* the property reverts to the Md. & Va. Eldership; the other Indian Springs deed (for the parsonage) contains no reverter clause whatever. [Emphasis in original.]

On appeal, the Supreme Court remanded for further consideration in the light of Presbyterian Church in the United States v. Maryland Elizabeth Blue Hull Memorial Presbyterian Church, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969). In *Hull*, the Supreme Court held that disputes within a religious organization involving control of property may not,

6. With regard to the generally recognized types of church "polity," or forms of church government, *see* Note, Judicial Intervention in *Disputes Over the Use of Church Property*, 75 Harv.L.Rev. 1142 at 1143–44 (1962), cited and quoted in *Sharpsburg* (at 662, 241 A.2d at 698):

At least three kinds of internal structure, or "polity," may be discerned; congregational, presbyterial, and episcopal. In the congregational form, each local congregation is self-governing. The presbyterial polities are representative, authority being exercised by laymen and ministers organized in an ascending succession of judicatories—presbytery over the *session* of the *local* church, synod over presbytery, and general assembly over all. In the episcopal form power reposes in clerical superiors, such as bishops. Roughly, presbyterial and episcopal polities may be considered hierarchical, as opposed to congregational polities, in which the autonomy of the local congregation is the central principle. [Footnotes omitted.]

consistently with the First Amendment to the Constitution of the United States, be determined by a civil court if such determination requires an examination into and resolution of questions of religious doctrine. But in so holding, Mr. Justice Brennan spoke for the Court as follows (at 449, 89 S.Ct. at 606):

> Thus, the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes. It is obvious, however, that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are neutral principles of law developed for use in all property disputes, which can be applied without "establishing" churches to which property is awarded. But First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice. If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern. Because of these hazards, the First Amendment enjoins the employment of organs of government for essentially religious purposes * * * [citation omitted]; the Amendment therefore commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine. Hence, States, religious organizations, and individuals must structure relationships involving church property so as not to require the civil courts to resolve ecclesiastical questions.

On remand in *Sharpsburg*, 254 Md. 162, 254 A.2d 162 (1969), Judge Barnes, again writing for the Court, concluded that, in its first opinion in *Sharpsburg*, the Court of Appeals of Maryland had reached its decision under "neutral principles of law" and "we * * *, therefore, adhere to our original decision in this case" (254 Md. at 178, 254 A.2d 171). The Supreme Court dismissed a subsequent appeal, noting in a per curiam opinion (Mr. Justice Brennan, joined by Mr. Justice Douglas and Mr. Justice Marshall, concurring specially):

> . In resolving a church property dispute between appellants, representing the General Eldership, and appellees, two secessionist congregations, the Maryland Court of Appeals relied upon provisions of state statutory law governing the holding of property by religious corporations, upon language in the deeds conveying the properties in question to the local church corporations, upon the terms of the charters of the corporations, and upon provisions in the constitution of the General Eldership pertinent to the ownership and control of church property. 254 Md. 162, 254 A.2d 162 (1969). Appellants argue primarily that the statute, as applied, deprived the General Eldership of property in violation of the First Amendment. Since, however, the Maryland court's resolution of the dispute involved no inquiry into religious doctrine, appellees' motion to dismiss is granted, and the appeal is dismissed for want of a substantial federal question. [396 U.S. *supra* at 367–368, 90 S.Ct. at 499, 500; footnotes omitted.]

In Polen v. Cox, *supra*, in which the property dispute was between a parent national body which was an unincorporated association and a local church which also was unincorporated,[7] the Minutes of

---

7. After the local church group withdrew, the minister of the local withdrawing group and several other members formed a corporation. 259 Md. at 28, 267 A.2d at 206. But at the time of the withdrawal, the local church was unincorporated.

General Assembly of the Church of God,[8] which "contain the basic governing and doctrinal positions of the Church," (259 Md. *supra* at 34, 267 A.2d at 206) provided as follows:

\* \* \* \* \* \*

If any local church shall cease to function or exist, then the local board of trustees shall hold the local property as trustees for the Church of God generally in the state where located, and said local board shall convey the local property to the state board to be used and disposed of by it for the use and benefit of the church in that state generally; \* \* \*

However in the event the majority or all of the local church depart from the faith or decide to discontinue fellowship with the organization, the state overseer shall have power to appoint other trustees to hold the property for the Church of God. [259 Md. at 35, 267 A.2d at 206.]

Judge Finan, after quoting those Minutes, wrote:

These provisions cover the disposition of property not only when the local church has ceased to function or exist but also when the majority decides "to discontinue fellowship with the organization." In his opinion the chancellor analogized the present case to the situation in *Sharpsburg* and concluded that since the local church had not ceased to function or exist, it was entitled to the property. However, in *Sharpsburg,* the national church made no provision for the disposition or control of the property in case of withdrawal. In the case at bar we think the Church of God clearly has made a determination that when a majority of a local church discontinues fellowship with the national church, the property does not follow. This is an example of a hierarchical church providing, "in its constitution or by some authoritative source for the reverting of the local church property to the hierarchical body upon withdrawal by a local congregation with an implied consent by the local church to this provision." *Sharpsburg,* 249 Md. 663, 241 A.2d 699. [259 Md. at 35–36, 267 A.2d at 206; footnote omitted.]

\* \* \* \* \* \*

\* \* \* [A]s we have stated previously, the *Sharpsburg* cases turned on the pivotal fact that the mother church failed to provide any rule or regulation regarding the disposition and control of local church property upon a withdrawal of the local congregation from the mother church. However, in the instant case the congregation of the local church once having impliedly consented to be bound by the Minutes of the mother church, cannot ignore the consequences attendant to withdrawing from that national body. [259 Md. at 38, 267 A.2d at 208.]

Thus, concluding that the local church had consented to be bound by those Minutes, Judge Finan held in Polen v. Cox, *supra,* that the national church had a right to control the local church property involved.

In these two cases at bar, there is no provision in the Knoxville or Locust Valley charters providing for forfeiture or reverter of the respective properties in the event of withdrawal from the denomination.[9] Nor do the

---

8. Judge Finan noted in *Polen*, 259 Md. at 36 n. 1, that the denomination therein was not the same denomination as the church involved in *Sharpsburg.* Thus, of course, it is not the same as the denomination involved herein.

9. The corporate charter of Locust Valley, as amended on December 28, 1907, contains no reference whatsoever to either the General Eldership or the Maryland and Virginia Eldership of the Churches of God. (*Cf. Sharpsburg, supra,* 249 Md. at 659, 241 A.2d at 691, where the Court of Appeals, in determining that neither of the corporate charters of the two defendant local churches in that case contemplated a reverter of local church properties in the event of withdrawal from the parent denomination, noted that "[i]n

constitutions or other organizational provisions of the General Eldership, or of the Maryland and Virginia Eldership, so provide.[10] *See Sharpsburg, supra,* 249 Md. at 663–665, 241 A.2d at 700. The Knoxville deed does state that if the local church "should become extinct or cease to be the property of the trustees hereinbefore described, the same shall become the property of the Maryland and Virginia Eldership of the Church of God." In *Sharpsburg,* Judge Barnes construed similar language in one of the Indian Springs deeds and held that it did not provide for a reverter "in the event of withdrawal by the local church from the Eldership" (249 Md. at 666, 241 A.2d at 700). In this case, similarly, Knoxville has not "become extinct" nor has its property "ceased to be the property of its trustees." Thus, the reverter clause in the Knoxville deed is not drawn into play by the withdrawal by the majority of its members. In the case of Locust Valley, its trustees hold title to several parcels of land by deeds which contain no reverter clauses whatever.

Plaintiffs herein contend, as was contended in *Sharpsburg,* that the Maryland General Religious Corporation Law, as construed and applied in *Sharpsburg,* violates the First and Fourteenth Amendments to the Constitution of the United States. The substance of plaintiffs' argument is that that law has permitted Locust Valley and Knoxville to change the polity, and thus the ecclesiastical authority, of the General Eldership from a presbyterial polity to a congregational polity and thus "establishes" a congregational polity or denies the "freedom of religion" of the General Eldership to govern the Churches of God under a presbyterial polity. That contention was rejected by Judge Barnes in *Sharpsburg* (249 Md. at 674, 241 A.2d at 705):

> * * * As we see it, this argument begs the question as it assumes that the polity of the Md. & Va. Eldership, so far as the property of the local churches is concerned, is presbyterial, whereas, as we have indicated, that polity in regard to the property of the local church, is congregational. * * * As we have indicated, no hierarchical denomination is required [by the Maryland statute] to have a congregational polity for the property of its local churches. If it chooses to have such a polity, this is entirely its own decision.

It is thus clear that the Maryland General Religious Corporation Law did not unconstitutionally interfere with the ecclesiastical relationship between the General Eldership and the defendant lo-

---

neither charter is the Md. & Va. Eldership or the General Eldership mentioned").

The Knoxville charter provides that the local church "shall be subject to the control of the Maryland and Virginia Eldership of the Churches of God and in all respects be governed by its rules and regulations, in so far as they are not at variance with Holy Scriptures." That charter, however, nowhere provides for the forfeiture or reverter of the Knoxville property in the event of withdrawal.

10. In 1968, the General Eldership amended its constitution to provide specifically for the retention of control in the parent church over local church property in the event that "a factional contest for the possession or control of property thereof arises in a local church * * *." That amendment, of course, came too late to aid the General Eldership in its present suit. *See* Polen v. Cox, *supra* at 37, 267 A.2d at 207, and Judge Finan's statement:

> * * * It would of course be a different matter if at the time they [the members of the local church] affiliated, the Minutes had provided for retention of the property by the local church upon withdrawal, and then the General Assembly changed the Minutes to provide the opposite. If upon the change in the Minutes, the Church withdrew, then implied consent to the change would not be possible. However, this was not the situation in the present case. Without any indications that the local congregation did not consider themselves bound by the Minutes, we think an implied consent to the withdrawal provisions must be inferred.

cal churches, but left the determination of that relationship entirely to the mother church and the local bodies. The Maryland law permits a denomination to adopt whatever intra-church arrangements it desires with regard to property matters. Thus, the mother church can provide by agreement with its local churches for control by the parent body of local church property upon local church withdrawal. The Maryland statute does not command that the property of any church incorporated thereunder be vested inalienably in its own local church trustees to the exclusion of control by any parent religious organization with which such church may be affiliated. On the contrary, the Maryland law leaves the distribution of control over local church property entirely to the voluntary arrangements entered into by and within each denomination. Thus, any incorporated local church and any parent or supervisory denominational body can agree among themselves to lodge such degree of control over local church property in such body or bodies as they select. Local religious corporations and their parent or supervisory bodies are just as free under the Maryland statute to bestow upon a parent or supervisory body control over local church property upon local church withdrawal as were the unincorporated bodies in Polen v. Cox, *supra*.

Plaintiffs, pointing to the special provisions in the Maryland General Religious Corporation Law which deal with the government of four religious denominations (see n. 5 *supra*), also urge that those provisions, which specifically protect the autonomy and hierarchical polity of those churches, render the entire law unconstitutionally discriminatory and violative of equal protection principles. Plaintiffs argue that the law protects the autonomy and polity of hierarchical churches named in the statute and fails so to protect the autonomy and polity of other hierarchical churches. That contention is but a repetition in another constitutional setting of plain-

tiffs' contention, discussed and rejected *supra* in a First Amendment context. As pointed out by the Court of Appeals in *Sharpsburg*, 249 Md. at 674, 241 A.2d at 705, the Maryland statute imposes no particular form of church government or property control upon any church incorporating thereunder, but leaves the matter entirely to the will of the churches involved. Whether or not the structure of the denomination in this case is "hierarchical" in its polity with respect to some matters is irrelevant. The central point is that, with respect to the use and control of local church property, neither the constitution of the General Eldership, nor the corporate deeds or other agreements between the Eldership and the local churches involved in this case, provided for the reverter of church property upon local church withdrawal. The fact that "the General Assembly [of Maryland] at the request or by acquiescence of the denomination involved" has adopted provisions governing other churches, which, as Judge Barnes noted in *Sharpsburg* (249 Md. at 674, 241 A.2d at 705), "are not involved in the present case," has in no way deprived any of the parties herein of the equal protection of the laws. But even assuming *arguendo* that the Maryland law is invalid for any reason, such invalidity would not aid the plaintiffs herein. Both under that law, and in the absence of that law, the voluntary internal agreements of the Eldership and the two local churches herein involved with regard to control of local church property upon withdrawal from the denomination are determinative. In Polen v. Cox, *supra*, those agreements provided for control by the national body; in this case, that control is lodged in the two local churches.

Accordingly, in each of these two cases, plaintiffs' motion for summary judgment is hereby denied and defendants' motion for summary judgment is hereby granted.

It is so ordered.