THE CALVARY PRESBYTERIAN CHURCH OF
BALTIMORE CITY ETC., ET AL. *v.* THE
PRESBYTERY OF BALTIMORE OF
THE UNITED PRESBYTERIAN
CHURCH, IN THE UNITED
STATES OF AMERICA
ET AL.

[No. 1114, September Term, 1977.]

*Decided May 12, 1978.*

The cause was argued before GILBERT, C. J., and MORTON
and MOORE, JJ.

*Gerald E. Topper* for appellants.

*Richard W. Kiefer* and *Dorothy M. Beaman* for appellees.

GILBERT, C. J., delivered the opinion of the Court.

The commandment of *Watson v. Jones,* 80 U. S. (13 Wall.) 679, 20 L. Ed. 666 (1871), addressed to the courts, is that thou shalt not delve deeply into jurisdictional disputes among churches.[1] That precept is a direct outgrowth of the First Amendment's fiat that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...."[2] U.S. Const. amend I. That language, as Thomas Jefferson viewed it, built "a wall of separation between church and State."[3] The "wall of separation" does not mean that courts have been stripped of all power to inquire into disputes arising among church members. Indeed, "[t]he state has a legitimate interest in keeping title and ownership in land settled and secure." Note, *Judicial Intervention in Church Property Disputes — Some Constitutional Considerations,* 74 Yale L.J. 1113, 1130 (1965). The State's interest in the protection of its citizenry necessitates that it know "at all times the owners of property within its borders," *Id.,* so that in the event one is injured on that property, the owner may be readily located. *Id.* Moreover, the State is cognizant of the words of Sir Henry Wotton (1568-1639) that "[t]he itch of disputing will prove the scab of churches,"[4] and it affords the disputants a forum for "some recourse other than the sword for settling their disputes...." *Id. See also The Maryland and Virginia Eldership of the Churches of God v. The Church of God at Sharpsburg, Inc.,* 249 Md. 650, 677, 241 A. 2d 691, 706-07 (1968), *vacated and remanded,* 393 U. S. 528, 89 S. Ct. 850, 21 L.Ed.2d 750 (1969).

---

1. "[W]henever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of ... [the] church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them." Watson v. Jones, 80 U. S. at 727, 20 L. Ed. at 676.

2. *See also* Maryland Declaration of Rights Article 36.

3. A "[r]eply to ... a Committee of the Danbury Baptist Assn. of Connecticut." January 1, 1802, in *The Complete Jeffersonian* p. 518-19 (assembled and arranged by Saul K. Padover (1943). A completely different concept of the church-state relationship was expressed by Pope Leo XIII, who referred to it as, "the fatal theory of the separation of Church and State."

4. *A Panegyric to King Charles* (1651).

The Circuit Court for Baltimore City was the forum in which the parties to this appeal went to resolve a church property ownership question. The late Judge Robert L. Sullivan decided the matter in favor of the appellees, The Presbytery of Baltimore of the United Presbyterian Church in the United States of America (United), an unincorporated association.[5] The appellants, The Calvary Presbyterian Church of Baltimore City (Calvary), a body corporate of the State of Maryland,[6] unmistakably aggrieved at Judge Sullivan's decision, have appealed to this Court.

Calvary advances two (2) issues, *videlicet:*

"1. Where there was no provision in its corporate charter, deeds or religious constitution, if THE CALVARY PRESBYTERIAN CHURCH OF BALTIMORE CITY voted to withdraw from THE PRESBYTARY OF BALTIMORE OF THE UNITED PRESBYTERIAN CHURCH IN THE UNITED STATES OF AMERICA to affiliate itself with another branch of the Presbyterian Church, The Presbyterian Church in America, did the right of possession and control of the local church property remain in CALVARY or could UNITED thereafter determine to dissolve CALVARY and seize CALVARY's property even though CALVARY remained Presbyterian in doctrine and affiliation?

2. Where the Appellant Church was incorporated in the year 1911, and thereafter acquired property in its name, under United States and Maryland Constitutions and stated circumstances, what was the legal effect of a subsequent legislative enactment calling for amendment of Appellants [*sic*] Church's Charter without CALVARY's consent or notice."

---

5. The other appellees are Wayne L. McCoy, Milton Leininger, James Riddell, John Klier, and Jean Rowlands, constituting an Administrative Commission of United. All appellees shall be referred to jointly as "United."

6. In addition to Calvary, the appellants are Louis C. Cerny, Leroy W. Bennett, John C. Duke, Jr., John C. Duke, Sr., Frank J. Cavanaugh, III, John J. Nickel, Sr., Clifford R. Nickel, Louis W. Lautenberger, and John A. Koutnik. For purposes of simplicity, the appellants are jointly referred to as "Calvary."

More ingeniously, the question before us is who owns the church property, Calvary or United?

## THE FACTS.

From the "Agreed Statement of Facts," we learn that United is organized and functions pursuant to a constitution which consists of two (2) parts: *The Book of Confession* and *The Book of Order*. It is the latter with which we are concerned.

The *Book of Order*[7] is divided into three (3) main subdivisions: 1) "The Directory for the Worship of God"; 2) "The Form of Government"; and 3) "The Book of Church Discipline." The first and third subdivisions deal with "questions of discipline, or of faith, or ecclesiastical rule, custom or law." *Watson v. Jones,* 80 U. S. at 727, 20 L. Ed. at 676. As such, we are precluded from inquiring into them by the constitutional barrier, erected by the First Amendment, between the church and the State.[8] We, therefore, turn our attention to *The Book of Order* subdivision entitled, "The Form of Government."

It is necessary to know that Calvary is one of the seventy-nine (79) United Presbyterian Churches located in Baltimore City and the counties of Allegany, Anne Arundel, Baltimore, Carroll, Frederick, Harford, Howard, and Washington. United is an association of Presbyterian churches governed by four (4) bodies styled as "judicatories." In ascending order of authority, the four (4) are:

1) the *session* which is "charged with maintaining the spiritual government of the congregation," *The Book of Order,* "The Form of Government," Ch. XI § 41.06 (1967), and those matters appertaining thereto. The session has "exclusive authority over the uses to which the church

---

7. The full name of the text is, *The Constitution of the United Presbyterian Church in the United States of America Part II The Book of Order* (1967).

8. "If nowhere else, in the relation between Church and State, 'good fences make good neighbors,'" said Mr. Justice Felix Frankfurter in McCollum v. Board of Education, 333 U. S. 203, 232, 68 S. Ct. 461, 475, 92 L. Ed. 649, 669 (1948) (concurring opinion).

buildings and properties may be put . . ." *Id.* at § 41.07;

2) the *presbytery* "consists of all the ministers . . . and at least one ruling elder commissioner from each church, within a certain district . . . [composed of not less than] twelve churches." *Id.* at Ch. XII § 42.01. It "has power to . . . decide [all] appeals, complaints, and references," *Id.* at § 42.08, properly brought, "and in cases in which the session cannot exercise its authority," *Id.,* the presbytery may assume original jurisdiction. Of more direct importance to the instant case is the fact that the presbytery possesses the power "to review and approve the records of church sessions, and to require their correction; to redress whatever they may have done contrary to order, and to take effectual care that they observe the Constitution of the Church . . ." *Id.;*

3) the *synod* is comprised "of the ministers and ruling elders of not fewer than three presbyteries within a specific geographic region." *Id.* at Ch. XIII § 43.01. *Inter alia,* it decides appeals from presbyteries;

4) "The *General Assembly* is the highest judicatory . . . and . . . represent[s] in one body all the particular churches thereof. It . . . bear[s] the title of The General Assembly of the United Presbyterian Church in the United States of America." *Id.* at Ch. XIV § 44.01. (Emphasis supplied.)

The "Agreed Statement of Facts" contains the following background eventually leading to the matter's being before us:

"A particular church can be organized only by the authority of the presbytery. The organization of the CALVARY congregation was approved by the Presbytery on October 4, 1910, and a corporation to

hold title to property for the congregation was formed on February 3, 1911. Article VI of its charter provides:

'ARTICLE VI. The "Calvary Presbyterian Church of Baltimore City" shall forever remain a Presbyterian Church in doctrine, government, and worship in accordance with the standards of the Presbyterian Church in the United States of American (sic), that is to say, the Confession of Faith, and the Larger and Shorter Cathechisms (*sic*), and in ecclesiastical connection with the "Presbytery of Baltimore," in accordance with its organization by said Presbytery, on the 4th day of October, in the year one thousand nine hundred and ten. . . .'

At the time CALVARY was incorporated, the Presbytery of Baltimore was part of the Presbyterian Church in the United States of America. At the 505th stated meeting of the Presbytery held on April 22 and 23, 1957, at which CALVARY's minister and one of its elders were present and voting, the Presbytery voted for the proposed plan of union with The United Presbyterian Church of North America. On May 28, 1958, The Presbyterian Church in the United States of America and The United Presbyterian Church of North America united to form the Church now known as THE UNITED PRESBYTERIAN CHURCH IN THE UNITED STATES OF AMERICA (UNITED). At the Presbytery's 511th stated meeting held on June 10, 1958, at which representatives of CALVARY were present and voting, the Presbytery took official notice of the union and the Church's new name.

In 1913, the Presbyterian Association, an arm of the Presbytery, acquired title to unimproved land on the west side of Patuxent Street, now Linwood

Avenue, and bounded on the south by McElderry Street and to the north by the center of Logan Street, and sold and conveyed a portion to CALVARY in 1914. CALVARY borrowed Eight Thousand Dollars ($8,000.00) from the Church Erection Fund of the General Assembly of The Presbyterian Church in the United States of America secured by a mortgage on the property. In 1930, The Presbyterian Association sold and conveyed the remainder of the land to CALVARY. CALVARY Church borrowed Four Thousand Five Hundred Dollars ($4,500.00) from the Board of National Missions of The Presbyterian Church in the United States of America secured by a mortgage on the property. All loans and mortgages have been paid, and title to the real property remains in the name of CALVARY.

CALVARY has been a member of and subject to the jurisdiction of the Presbytery of Baltimore since its founding in 1911 and has, until the latter part of 1975 or early part of 1976, been a full voting participant in the affairs of the Presbytery. For the past 64 years, from 1911 through 1975, the CALVARY session regularly submitted its records to the Presbytery for review and approval in accordance with the *Form of Government....*

The first official record of any conflict between the members of the CALVARY session and the Presbytery appears in the minutes of the regular meeting of the session held June 11, 1975. The minutes relfect [*sic*] the following entry:

'Because of recent developments a motion was made, seconded and approved to send a complaint to the Synod of the Piedmont.[9]

TO THE SYNOD OF THE PIEDMONT

Rev. Charles F. Kukal and the Session of Calvary Presbyterian Church, complainant,

9. Obviously the name by which the particular synod to which Calvary belongs is known.

hereby complains to the Synod of the Piedmont, against the action of the Presbytery of Baltimore, made at the Deer Creek Harmony Church in Darlington, Maryland, on the 22nd day of May, 1975* * *

Complainant says he has a right to complain because he is a minister enrolled as a member of the Presbytery of Baltimore, and as a session subject to and submitting to the jurisdiction of the Presbytery of Baltimore.'

The CALVARY session met on December 17, 1975, and the minutes of that meeting contain the following:

'RECOMMENDATION: The following motion made, seconded and approved:

The Session of Calvary Presbyterian Church recommends to the congregation that we, as a church, disassociate ourselves from the United Presbyterian Church, United States of America, and ecclesiastical connection with the Presbytery of Baltimore and seek affiliation with the Presbyterian Church in America.'

A special meeting of the CALVARY congregation was held on December 28, 1975, the minutes of which reflect ... [the adoption of the recommendation].

. . .

In addition to UNITED, there are a number of other denominations using the word 'Presbyterian' in their names.... [There are two (2) large Presbyterian churches, United and the Presbyterian Church in the United States.] There are a number of smaller splinter denominations, one of which is the Presbyterian Church in America, which the

Appellants have joined. Because of their Presbyterian form of government, all of these churches have sessions governing the individual churches, presbyteries, synods and General Assemblies. However, though there may be local churches in the Baltimore area associated with some of these other Presbyterian Churches, none of them have a presbytery located in Baltimore.

[The Calvary session issued its 'call to arms' on January 9, 1976. In a letter to the membership of Calvary, the session enumerated nine (9) specific items of discontent with United, and made clear that the nine (9) were 'not a complete list.' The session correctly prophesied that United would not sanction the 'dismissal of a congregation with its property.' The membership was informed that '[a] legal fight to retain the property' would come about if Calvary disassociated itself with United.]

At the regular annual meeting of the congregation held on January 18, 1976, the CALVARY congregation reaffirmed its action of December 28, 1975.

The Presbytery at its regular monthly meeting on January 22, 1976, adopted the following resolution:

'WHEREAS, the Presbytery of Baltimore is informed that the Calvary United Presbyterian Church at a congregational meeting on January 18, 1976 did arbitrarily and illegally vote to disassociate itself from the UPCUSA and that it is affected by this and other possible disorders,

Therefore, BE IT RESOLVED:

A. That the Presbytery of Baltimore authorize an Administrative Commission for the purpose of investigating and formulating recommendations to the Presbytery of Baltimore with respect to possible disorders in the Calvary United

Presbyterian Church, and particularly to recommend to the Presbytery whether or not the Session should be dissolved and replaced by an Administrative Commission as described in Book of Order 41.15. * * *

E. That the Administrative Commission shall complete its investigation and submit its recommendations at an adjourned meeting of this Presbytery on Tuesday, February 3, 1976 at Faith Church in Baltimore at 4:00 P.M. * * *

G. That the Stated Clerk and the Moderator shall communicate promptly and directly to the members of the Calvary United Presbyterian Church this action taken by the Presbytery of Baltimore. * * * '

The Administrative Commission investigated the alleged disorders, advised the Clerk and individual members of the Session of CALVARY, by a letter dated January 27, 1976, and sent to each of said members, both by registered and ordinary mail, that the Commission intended to recommend to the Presbytery at its meeting to be held on February 3, 1976 that Presbytery appoint a new Administrative Commission composed of ministers and ruling elders with the full power of a Session to take the place of the existing Session of CALVARY, after which the present Session of CALVARY would cease to act until such time as Presbytery should otherwise direct and further advising said Appellants that they would be afforded an opportunity for a hearing before said Presbytery at said meeting.

The Presbytery met on February 3, 1976, at 4:00 P.M., at the Faith Presbyterian Church, for the purpose of hearing and acting on the report of the Administrative Commission. The Commission presented its report and unanimously recommended that the Session of CALVARY be dissolved and a

new Administrative Commission assume the duties of said Session. No members of the CALVARY Session nor any other members of the congregation of CALVARY made known his presence, if in fact any were present, or raised any defenses to said recommendations and the Presbytery unanimously adopted the following resolution:

> 'That the Session of the Calvary Presbyterian Church be dissolved effective February 3, 1976, and that the moderator appoint an Administrative Commission to assume the duties of the Calvary Session until such time as the Commission so appointed and charged recommends other actions to the Presbytery.'

The individuals named as Appellees in this action were appointed to be the Administrative Commission to assume all the duties and responsibilities of the CALVARY Session.

Thereafter, by arrangement of legal counsel for both parties, the Administrative Commission met informally with members of the deposed session on March 24, 1976 at the Church. At this meeting, the leaders of the deposed session made it clear that the members of the deposed session and the Board of Trustees refused to recognize the authority of the Administrative Commission and the Presbytery.

Further offers by the Commission to meet with members of the deposed session were rejected and finally the Commission, acting in its capacity as Session of the CALVARY Church, called a meeting of the congregation on Sunday, October 17, 1976, at the Church. When members of the Commission arrived at the Church, they were requested to leave the premises by Officers of the Baltimore City Police Department, who had been summoned to the premises by members of the deposed session."

After issue was joined in the circuit court, United filed a motion for summary judgment, under Md. Rule 610. Judge Sullivan granted the motion.

## THE LAW.

Calvary asserts that the chancellor "delved deeply into the religious law and usage to arrive at his decision," citing the concurring opinion of Mr. Justice Brennan in *Maryland and Virginia Eldership of the Churches of God v. Church of God at Sharpsburg, Inc.,* 396 U. S. 367, 369, 90 S. Ct. 499, 500-01, 24 L.Ed.2d 582, 584 (1970) (concurring opinion). Justice Brennan wrote:

> "Under *Watson* civil courts do not inquire whether the relevant church governing body has power under religious law to control the property in question. Such a determination, unlike the identification of the governing body, frequently necessitates the interpretation of ambiguous religious law and usage. To permit civil courts to probe deeply enough into the allocation of power within a church so as to decide where religious law places control over the use of church property would violate the First Amendment in much the same manner as civil determination of religious doctrine." (Footnote omitted.)

We observe that Mr. Justice Brennan's remarks were contained in a concurring opinion, not the opinion of the Court, and secondly, they are pure *dicta* as any reading of Judge Barnes's opinion in *The Maryland and Virginia Eldership of the Churches of God v. The Church of God at Sharpsburg, Inc.,* 254 Md. 162, 254 A. 2d 162 (1969), will reveal. Both *Sharpsburg* cases, 249 Md. 650, 241 A. 2d 691 (1968), *vacated and remanded,* 393 U. S. 528, 89 S. Ct. 850, 21 L.Ed.2d 750 (1969), and 254 Md. 162, 254 A. 2d 162 (1969), *appeal dismissed,* 396 U. S. 367, 90 S. Ct. 499, 24 L.Ed.2d 582 (1970), decided by the Court of Appeals made manifest that the Court was not passing upon "any doctrinal or theological issue," 254 Md. at 173, 254 A. 2d at 169, but was deciding the

case upon "neutral principles of law." *Id. See also Hayman v. St. Martin's Evangelical Lutheran Church,* 227 Md. 338, 176 A. 2d 772 (1962).

We do not read *Watson* as proscribing *all* inquiry by a court of church disputes, but only those dealing with "questions of discipline, or of faith, or ecclesiastical rule, custom, or law. . . ." *Watson v. Jones,* 80 U. S. at 727, 20 L. Ed. at 676. Were it otherwise, controversies such as in the case *sub judice* might never be resolved, and the title to the church property would be enmeshed in a quagmire from which extrication would be nearly impossible. Title to property cannot be allowed to drift about in an atmosphere of uncertainty. It must be vested in someone, *Georges Creek Coal and Iron Co.'s Lessee v. Detmold,* 1 Md. 225, 238 (1851), "and in such force, that an injury to the possession can be redressed by an action at law." *Id.*[10] Neither *Watson* nor the First Amendment condemn the courts' deciding ownership of church property, so long as the relevant inquiry is whether the question can be decided "on the basis of neutral principles of law which do not involve the resolution *by the court* of ecclesiastical issues," *Polen v. Cox,* 259 Md. 25, 30, 267 A. 2d 201, 204 (1970), or doctrinal proprieties.

We think Judge Finan stated it as well as it can be said when he wrote that "[t]he standard [used by the courts] must be whether the parties by the acts and documents which have governed their relationship have made it possible for a civil court to resolve control of property without the court itself having to make ecclesiastical determinations." *Id.* at 32, 267 A. 2d at 205.

Applying the dictates of *Polen* to the instant case, we note that the corporate charter of Calvary provided in Article VI, quoted textually above, that Calvary "shall remain forever a Presbyterian Church in . . . government . . . in accordance with the standards of the Presbyterian Church in the United States of American (sic)." On May 28, 1958, the Presbyterian Church in the United States of America merged with The United Presbyterian Church of North America. By the union

---

10. That title must be vested is the principle behind the rule against perpetuities as well as intestacy and testacy laws. What a chaotic condition would arise if titles were held "in abeyance."

of the two (2) churches, there was formed the present The United Presbyterian Church in the United States of America.[11]

Calvary seeks refuge behind the conveyance to it in 1913, as a corporate body, of the real property heretofore described. Calvary earnestly contends that it, as a corporation, owns the property in its own name free and clear of United. We think that Calvary's reliance on the 1913 deed is akin to standing on quicksand. There are two (2) decisive factors that cause Calvary to fail to hold its position. First, Chapter XI § 41.08 of "The Form of Government" by which Calvary agreed to be bound provides in pertinent part:

> "8. The church session shall have authority over all of the affairs and activities of the particular church, except such matters as may, by this Form of Government, be specifically accorded "to ... a higher judicatory. The session may from time to time delegate administrative responsibilities in respect to the care and management of church properties and in respect to the financial affairs of the church either to the board of trustees or to the board of deacons or in part to one and in part to the other, subject always to the superior authority and direction of the session."

The session is the overseer of the church property subject, however, to a higher judicatory, if "The Form of Government" specifically accords that authority to the higher judicatory. Chapter XXXII § 62.11 of "The Form of Government" provides:

> "11. Whenever hereafter a particular church is formally dissolved by the presbytery, or has become extinct by reason of the dispersal of its members, the abandonment of its work, or other cause, such property as it may have, both real and personal, shall

---

11. The "Agreed Statement of Facts" discloses that "Calvary's minister and one of its elders were present and voting" at the time the proposal for union was adopted at the 505th stated meeting of the Presbytery.

be held, used, and applied for such uses, purposes, and trusts as the presbytery may direct, limit, and appoint, or such property may be sold or disposed of as the presbytery may direct, in conformity with the Constitution of the United Presbyterian Church in the United States of America."

Moreover, the Legislature has provided in Md. Corp. & Ass'ns. Code Ann. § 5-331 (a) (Cum. Supp. 1977):

"*Certain charters deemed amended.* — To the extent not prohibited by the Constitution of the United States or of this State, the charter of each religious corporation subject to this part and incorporated before June 1, 1957, is deemed to be amended to conform to the constitution of the United Presbyterian Church in the United States of America and its successors, as from time to time in effect." [12]

Second, Judge Barnes, in *Sharpsburg* I pointed out that:

"[T]here are three methods by which a hierarchical denomination may maintain control of local church property:

1. It may require reverter clauses in the deeds to the property of the local churches.

2. It may provide in its constitution or by some other authoritative source for the reverting of the local church property to the hierarchical body upon withdrawal by a local congregation with an implied consent by the local church to this provision.

3. It may obtain from the ... [Legislature] an act providing for such a result." 249 Md. at 663, 241 A. 2d at 699.

It may readily be seen that United has exercised two (2) of the three (3) methods of maintaining "control of local church property." *Id.* Either of the two (2), in our view, would have been sufficient.

---

12. The current statute is, according to the Revisor's note, derived without substantive change from former Md. Ann. Code art. 23, § 314 (c).

We think it apparent that Calvary holds title to its physical property for the benefit of United. "The Form of Government" manifests that all church property is owned by United. When Calvary became associated with United's predecessor, which association continued with United, it did so with the clear understanding that the Calvary church buildings became and continue to be the property of United. Moreover, lest there be any lingering doubt, the Legislature has eradicated it by virtue of Md. Corp. & Ass'ns. Code Ann. § 5-331 (a) (Cum. Supp. 1977).

We hold that Judge Sullivan did not delve into an area in which the courts are prohibited from entering; nor did he err in determining, on the basis of neutral principles, that control of the Calvary church property belongs to United.

*Judgment affirmed.*
*Costs to be paid by appellants.*