672 A.2d 679

**BOARD OF INCORPORATORS OF the AFRICAN METHODIST EPISCOPAL CHURCH, INC., et al.**

**v.**

**MT. OLIVE AFRICAN METHODIST EPISCOPAL CHURCH OF FRUITLAND, INC., et al.**

**No. 982 Sept. Term, 1995.**

Court of Special Appeals of Maryland.

March 5, 1996.

Certiorari Granted March 8, 1996.

552

Thomas E. Starnes (Scott A. Richie, A. Lindsey Crawford, Andrews & Kurth, L.L.P., Washington, DC, and Leronia A. Josey Baltimore, on the brief), for Appellants.

John C. Seipp (A. Gillis Allen, II, Karen S. Payne, and Adkins & Allen, L.L.P., on the brief), Salisbury, for Appellees.

Argued before WENNER and DAVIS, JJ., and PAUL E. ALPERT, Judge (Retired), Specially Assigned.

DAVIS, Judge.

This appeal involves a dispute between a parent church and one of its former local congregations over the ownership and control of two parcels of local church property. The following question, as we restate it, is presented for our review:

> Did the circuit court err in determining that, subsequent to the local church's secession from the parent church, the local church retained sole and exclusive ownership of its local church property free and clear from all interests and claims of the parent church?

We respond in the affirmative, and therefore, reverse the judgment of the circuit court.

## FACTS

The desire of a minority of local worshipers to break away from their parent church organization for reasons growing out of their dissatisfaction with the parent church and the inability of the parent church to meet those worshipers' needs marks the history of the African Methodist Episcopal Church (AME

Church). In the *History of the African Methodist Episcopal Church*, Reverend D.A. Payne of Baltimore wrote:

> This humble branch of the Redeemer's Church was founded in the year 1816, in the city of Philadelphia, by Rev. Richard Allen, (afterwards its first Bishop,) Rev. Daniel Boker, Rev. James Champion, Rev. Clayton Durham, and others, whose names have not reached the present time. The organization of said church, took place in a convention held for ecclesiastical purposes, by a large number of colored persons, who had seceded from the Methodist Episcopal Church, both in the city of Philadelphia and Baltimore, for reasons which they considered perfectly justifiable in themselves;—reasons growing out of their circumstances as an oppressed people, in church as well as in state.

Rev. D.A. Payne, *History of the African Methodist Episcopal Church* as contained in the third edition of the *History of all the Religious Denominations in the United States* (published by John Winebrenner, V.D.M.) (Harrisburg, Pa.1852). In the 1992 Doctrine and Discipline [1], the birth of the AME Church by secession is described as follows:

> In November 1787, the coloured people belonging to the Methodist Society in Philadelphia convened together in order to take into consideration the evils under which they laboured, arising from the unkind treatment of their white brethren, who considered them a nuisance in the house of worship, and even pulled them off their knees while in the act of prayer, and ordered them to the back seats. From these, and various other acts of unchristian conduct, we considered it our duty to devise a plan in order to build a house of our own, to worship God under our own vine and fig tree: In this undertaking, we met with great opposition from an elder of the Methodist church (J.M.C.) who threat-

---

1. The "Doctrine and Discipline of the African Methodist Episcopal Church" (also called the "Book of Discipline of the African Methodist Episcopal Church") (Discipline) is akin to a constitution or charter document for the AME Church. Apparently, every four years the Discipline is updated. Over the course of its history, therefore, the AME Church has issued many "editions" of the Discipline.

ened, that if we did not give up the building, erase our names from the subscription paper, and make acknowledgements for having attempted such a thing, that in three months we should all be publicly expelled from the Methodist Society. Not considering ourselves bound to obey this injunction, and being fully satisfied we should be treated without mercy, we sent in our resignations.

Today, with an estimated 3.5 million members, the AME Church is one of the largest Protestant denominations in the U.S. THE WORLD ALMANAC AND BOOK OF FACTS 726–27 (1994). As we shall discuss more fully below, unlike a "congregational" organization in which virtually all power resides in the local church, the AME Church is a "hierarchical" church. The AME Church structure, therefore, consists of the many local AME congregations under the "umbrella" authority of the parent AME Church. In this regard, the AME Church describes its hierarchial structure as a "connectional" church.

In 1886, seventy years after the birth of the AME Church, the Carr Black Church was established in Fruitland, Maryland, on a parcel of land donated by the Carr Black family. One year later, the church became affiliated or "connected" with the AME Church and changed its name to the Mt. Olive A.M.E. Church. On April 13, 1894, the Mt. Olive A.M.E. Church was formally incorporated under Maryland law as evidenced by a handwritten certificate of incorporation filed with the Clerk of the Circuit Court for Wicomico County. We shall discuss the terms of this document in much detail below.

Early in its history, the church moved from its original site. Today, the physical church consists of two parcels of land—the parsonage property (acquired in 1913), and the sanctuary property (acquired in 1975). The record reasonably reflects that the sanctuary property is considered the "crown jewel" of the local church. The deeds for these parcels designate Mt. Olive A.M.E. Church as the corporate grantee of the proper-

ties "in fee simple."[2] The local congregants maintain that none of the money used to buy, maintain, and improve the church property came from the AME Church.

For over one hundred years, the Mt. Olive A.M.E. Church remained a part of the larger AME Church organization. In this regard, the Mt. Olive A.M.E. Church adopted the customs, policies, and literature of the AME Church. Furthermore, the local church accepted pastors and ministers appointed by the AME Church, and paid dues and assessments to the AME Church.[3]

Proving that history tends to repeat itself, however, the congregation of the Mt. Olive A.M.E. Church voted in September 1993 to withdraw from the AME Church. The September 25, 1993 resolution reflecting this withdrawal cites a number of reasons for the congregation's desire to cut its ties with the AME Church, including the AME Church's burdensome financial demands on the congregation, a lack of compassion from the AME Church for the small congregation's financial condition, and a total decline in the moral conditions in the AME Church. The resolution was signed by seven church "stewards" and "stewardesses," nine church "trustees," and five church "class leaders." In addition, twenty-two members signed the resolution. The congregation subsequently changed its name to the Mt. Olive Christian Church (Mt. Olive).[4]

---

**2.** During argument on motions for summary judgment (discussed below), appellants' counsel agreed that the deeds did not contain a reverter provision whereby the property would revert to the appellants upon appellees' separation from the AME Church. Counsel also agreed that the AME Church is not mentioned in the deeds.

**3.** During argument on motions for summary judgment (discussed below), appellees' counsel informed the circuit court that there was no dispute regarding the foregoing facts.

**4.** Materials in the record indicate that after its withdrawal Mt. Olive referred to itself by several names: Mt. Olive Free A.M.E. Church of God, Mt. Olive Church, and Mt. Olive Christian Church. As the precise name is not important on this appeal, we shall refer to the unaffiliated church as Mt. Olive.

On September 20, 1993, Reverend John O. Jones, the pastor that the AME Church assigned to the Mt. Olive A.M.E. Church, announced his resignation from the AME Church by letter to Earle M. Brooks, the Presiding Elder of the Baltimore District of the AME Church. By letter dated September 29, 1993, Brooks regretfully accepted Jones's resignation, and requested, among other things, that Jones surrender the keys to the Mt. Olive building and remove all personal belongings from the church. In early October 1993, Brooks assigned a new pastor to take over for Jones. Jones, however, continued to lead worship services in the Mt. Olive building. In mid-October 1993, local counsel for the AME Church informed Jones by letter that his continued occupation of the building was in violation of the Discipline, and requested him to "cease and desist from doing any acts which impair, encumber or waste any church assets, including personal or real property."

In November 1993, when it became clear to the AME Church that Jones and his followers would not voluntarily relinquish possession of the property to the new pastor and the members retaining affiliation with the AME Church, a petition for declaratory relief and injunctive relief was filed in the Circuit Court for Wicomico County. As appellants explain, the plaintiffs (appellants on this appeal) named in that petition are Mt. Olive A.M.E. Church, Inc., by and through four of its members and four of its trustees who have maintained affiliation with the AME Church; Bishop Frederick Calhoun James (presiding Bishop of the Second Episcopal District of the AME Church and Chairman of the Board of Trustees of the Baltimore Annual Conference of the AME Church); Brooks; the Board of Trustees of the Baltimore Annual Conference of the AME Church; and the Board of Incorporators of the AME Church. As appellants also explain, the defendants (appellees on this appeal) are Jones and eight former members and trustees of the Mt. Olive A.M.E. Church.

Both parties filed motions for summary judgment. Hearings on the motions were held on June 16, 1994 and February 17, 1995. At the close of the February 17, 1995 hearing, the

trial court issued its ruling from the bench, granting summary judgment in favor of appellees. A written order granting appellees' motion for summary judgment followed on February 22, 1995. In addition, on February 27, 1995, the circuit court issued a written Order for Declaratory Relief in appellee's favor. This order declared appellees to be the sole and exclusive owner of the Mt. Olive property, free and clear of any claim or interest of appellants.

From these orders, appellants appeal to this Court.

## DISCUSSION

## I

### Legal Principles Related to Church Property Disputes

 To avoid running afoul of the First Amendment, courts must resolve church property disputes without regard to underlying church controversies over religious doctrine. *Babcock Memorial Presbyterian Church v. Presbytery of Baltimore of the United Presbyterian Church in the United States of America,* 296 Md. 573, 588–89, 464 A.2d 1008 (1983); *Maryland & Virginia Eldership of the Churches of God v. Church of God at Sharpsburg,* 254 Md. 162, 165, 175, 254 A.2d 162 (1969) (*Eldership II* ). Thus, courts must be careful to steer clear of a " 'theological thicket.' " *Maryland & Virginia Eldership of the Churches of God v. Church of God at Sharpsburg,* 249 Md. 650, 660, 241 A.2d 691 (1968) (*Eldership I* ). This means, therefore, that a court must apply "neutral principles of law" to settle church property disputes. *Babcock,* 296 Md. at 588–89, 464 A.2d 1008; *Eldership II,* 254 Md. at 165, 175, 254 A.2d 162. *Eldership I* and *Eldership II*[5] are the

---

**5.** By per curiam opinion, the United States Supreme Court vacated and remanded *Eldership I* to the Court of Appeals for further consideration in light of *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church,* 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969). *Maryland & Virginia Eldership of Churches of God v. Church of God at Sharpsburg, Inc.,* 393 U.S. 528, 89 S.Ct. 850, 21 L.Ed.2d 750 (1969). After remand, the Court of Appeals, in *Eldership II,* affirmed *Eldership I.* After the decision in *Eldership II,* the Supreme

seminal Maryland cases applying the "neutral principles of law" doctrine to resolve such disputes. Accordingly, an understanding of the *Eldership* cases is critical to the disposition of this appeal.

In the *Eldership* cases, the congregations of two churches—the Church of God at Sharpsburg (Sharpsburg church) and the Indian Springs Church of God (Indian Springs church)—voted to withdraw from the Maryland and Virginia Eldership (Eldership). *Eldership I,* 249 Md. at 654–55, 241 A.2d 691. The General Eldership of the Churches of God in North America (General Eldership) is a religious denomination of which the Eldership is a part. *Id.* at 653, 241 A.2d 691. Upon these withdrawals, the General Eldership issued a "judgment" stating that those who had withdrawn from the Eldership have " 'abandoned and forfeited all rights, privileges, properties and offices in the local church and in the Churches of God....' " *Id.* at 655, 241 A.2d 691. The Eldership then revoked the Sharpsburg church pastor's and the Indian Springs church pastor's annual ordination certificates. *Id.* Despite this action, the church councils of both churches continued to employ their pastors and refused to allow new pastors appointed by the Eldership to preach in their respective local churches. *Id.* at 656, 241 A.2d 691.

In response, the Eldership filed suit against the churches to determine, among other things, whether the local churches or whether the Eldership should control the respective church property. *Id.* at 653, 241 A.2d 691. The chancellor dismissed the Eldership's complaints, and the Eldership appealed to the Court of Appeals. *Id.* The issue on appeal was whether, under the applicable provisions of State statutes, the provisions of the constitutions of the Eldership and General Eldership, the corporate charters of the local churches, and under

Court dismissed the appeal because "the Maryland court's resolution of the dispute involved no inquiry into religious doctrine...." *Maryland and Virginia Eldership of Churches of God v. Church of God at Sharpsburg, Inc.,* 396 U.S. 367, 90 S.Ct. 499, 24 L.Ed.2d 582 (1970) (Per Curiam). As a consequence, both *Eldership* cases are valid and controlling precedent in Maryland.

the deeds of property to the trustees of the local churches, a local congregation may withdraw from its denomination and retain control of local church property. *Id.* at 656, 241 A.2d 691.

*Eldership I* explained as follows the analysis required to resolve this issue:

In considering questions in regard to the use of church property it is usually important, in the absence of express language in the deed conveying the property or making the gift, to consider the "polity" or form of church government which the particular denomination has. In the note in 75 Harv.L.Rev., at pages 1143–4, the three general types of church polity are defined as follows:

"At least three kinds of internal structure, or 'polity,' may be discerned; congregational, presbyterial, and episcopal. In the congregational form, each local congregation is self-governing. The presbyterial polities are representative, authority being exercised by laymen and ministers organized in an ascending succession of judicatories— presbytery over the session of the local church, synod over presbytery, and general assembly over all. In the episcopal form power reposes to clerical superiors, such as bishops. Roughly, presbyterial and episcopal polities may be considered hierarchical, as opposed to congregational polities, in which the autonomy of the local congregation is the central principle." (Footnotes omitted).

In many of the hierarchical churches there may be provisions in their Constitutions, Canon Law or other controlling documents or statutes which make it clear that the property is held in trust for the uses of the parent church and its discipline and appointments.... There may be a requirement that the local church include provisions in the deeds to its property that it is held in trust for the parent church in conformity to its worship, doctrine and discipline and, upon departure therefrom, the property will revert to the hierarchical body. Even in the absence of such an express provision in the deeds to the local church property, there may be implied consent by the local church that the local

property is so held if the constitution by-laws, cannon law or statute provide to that effect. It thus appears that there are three methods by which a hierarchical denomination may maintain control of local church property:

1. It may require reverter clauses in the deeds to the property of the local churches.

2. It may provide in its constitution or by some other authoritative source for the reverting of the local church property to the hierarchical body upon withdrawal by a local congregation with an implied consent by the local church to this provision.

3. It may obtain from the General Assembly an act providing for such a result.

*Id.* at 662–63, 241 A.2d 691. After setting forth the foregoing principles, the Court of Appeals turned to the resolution of the dispute.

Initially, the Court of Appeals examined the polity of the Church of God. *Id.* at 663, 241 A.2d 691. The Court observed that a "denomination need not adhere strictly to any one of the three polities mentioned—episcopal, presbyterial or congregational. It may avail itself of parts of one, two, or even all three." *Id.* In this regard, "merely because a denomination has some of the characteristics of one type of polity, some of the characteristics of other polities are not excluded." *Id.* at 664, 241 A.2d 691. The Court then concluded that although the Church of God appeared to have a general hierarchical structure, "[t]his does not, however, exclude the use of a congregational polity so far as the use and control of property of the local congregation is concerned...." *Id.* As a result, the Court turned to the examination of other sources.

Next, the Court examined the constitution of the General Eldership. *Id.* at 664–65, 241 A.2d 691. The General Eldership's constitution failed to contain a statement regarding the ownership or control of local church property. *Id.* The Court also examined the constitution of the Eldership and found a provision relating to deeds stating " '[t]hat should the [local] church *become extinct, or cease to be,* the property [of the

local church] shall be the property of the [Eldership].' " *Id.* at 665, 241 A.2d 691. Thus, although it legitimately could, neither constitution contained "*any prohibition against the withdrawal* from the Eldership of a local congregation nor is there any provision for loss or forfeiture of property by a local congregation if it does withdraw from the Eldership." *Eldership II,* 254 Md. at 172, 254 A.2d 162.

The Court of Appeals then construed the deeds for the local church properties, and observed that they too failed to provide for a reversion in the event that the local church separated from the parent church. *Eldership I,* 249 Md. at 665, 241 A.2d 691. The Sharpsburg church deed, for example, provided that the trustees of the church held the property " 'in trust for the use of the congregation of the Church of God at Sharpsburg, Maryland,' " and that in the event that the Sharpsburg church congregation " '*ceases to function as a church organization,* then all right, title and interest in the hereinabove described property shall immediately vest in the [Eldership].' " *Id.* Similarly, one of the Indian Spring church deeds provided for a reversion to the parent church in the event that the local church became extinct. *Id.* Thus, the deeds provided for a reversion of local property to the parent church only if the local church should "*become extinct* " or "*cease to be* "—events that did not occur. *Eldership II,* 254 Md. at 169, 254 A.2d 162. Consequently, the deeds did not provide that local church property would revert to the parent church upon the local church's separation from the parent church. *Id.*

The *Eldership* cases make clear that, in addition to examining the form of polity, the parent church's constitution, and the language in the deeds, the local church's charter provisions are also relevant in resolving a church property dispute. The Court of Appeals, therefore, observed that the charters of the local churches conferred on the incorporated churches and their trustees the ownership, use, management and sale of the local church property, subject to the provisions of the local bylaws. *Eldership I,* 249 Md. at 658, 241 A.2d 691. Significantly, the Indian Spring church charter expressly provided

that its association with a larger denomination would not affect its ownership and control of property. *Id.* at 659, 241 A.2d 691. Apparently, also of importance to the Court of Appeals was the fact that neither church's charter mentioned the Eldership or the General Eldership. *Id.* According to the Court,

> These charter provisions make it plain that it was never contemplated that the property of the local churches should be subject to the control of the Eldership. It can only be concluded from the examination of the language of these charters that the local church corporations own and control their local property.

*Eldership II,* 254 Md. at 170, 254 A.2d 162.

In light of its analysis of the above-mentioned sources, the Court of Appeals held that the local churches retained control of the church property subsequent to departing from the parent church, and therefore, affirmed the chancellor's determination. *Eldership I,* 249 Md. at 656, 241 A.2d 691. The *Eldership* cases, therefore, are a prime example of local church property remaining in the hands of the congregation of the local church following its vote to secede from the larger denomination.

In contrast, *Babcock* is an example of the *Eldership* analysis yielding the opposite outcome. As *Babcock* is an important case in the *Eldership* line of cases, we shall examine it closely. In *Babcock,* certain ecclesiastical disputes arose between the Babcock Memorial Presbyterian Church (Babcock) and the higher judicatories of The United Presbyterian Church in the United States of America (United) and the Presbytery of Baltimore of the United Presbyterian Church in the United States of America (Presbytery). *Babcock,* 296 Md. at 575, 464 A.2d 1008. At a meeting, the "Session" of Babcock voted to recommend to its congregation that action be taken to sever Babcock's relationship with United and the Presbytery. *Id.* The Session then made an absolute and irrevocable gift of its church property to the Merritt Boulevard Presbyterian Church of Dundalk (Merritt)—an unaffiliated Presbyterian

church. *Id.* at 575, 575 n. 4, 464 A.2d 1008. After Babcock's deed to Merritt had been recorded in the Baltimore County land records, a letter advising of the gift transfers was delivered to the Presbytery. *Id.* at 575–76, 464 A.2d 1008. Subsequent to these actions, Babcock's congregation overwhelmingly voted to withdraw from United and the Presbytery, and ratified and adopted the Session's action with respect to the gifts to Merritt. *Id.* at 576, 464 A.2d 1008. Babcock's actions caused an administrative commission of the Presbytery to assume possession of the Babcock church property and require Babcock congregants to leave the premises. *Id.* In addition, the Presbytery's administrative commission denied Merritt congregants access to the church. *Id.*

Thereafter, Merritt filed suit to regain possession of the church, and the Presbytery filed suit to have the deeds set aside. *Id.* The Circuit Court of Baltimore County found that United maintained a congregational polity with respect to the ownership and control of local church property, and that Babcock was legally entitled to give its property to Merritt. *Id.* at 577, 464 A.2d 1008. On appeal of that decision, this Court reversed the trial court's determination. *Id.* The Court of Appeals granted certiorari, and affirmed our decision. *Id.*

In so doing, the Court of Appeals made the following observations. Originally incorporated in 1891, Babcock's corporate charter stated that the church should " 'forever remain a Presbyterian Church in accordance with the Standards of the Presbyterian Church of the United States,' " *id.* at 577, 464 A.2d 1008, and that virtually from its inception the church was a member of the Presbytery. *Id.* at 578, 464 A.2d 1008.[6] In 1968, Babcock adopted bylaws, a section of which provided that Babcock " 'is affiliated with [United] and is under the care and subject to the jurisdiction of the Presbytery of Baltimore.

---

**6.** The Court also recognized that, under Maryland's system for incorporating religious organizations, the trustees—not the congregation— constitute the corporation. *Babcock,* 296 Md. at 578, 464 A.2d 1008 (citing *Phillips v. Insley,* 113 Md. 341, 349, 77 A. 850 (1910)).

These By–Laws shall be subordinate to the Constitution of [United]. . . .' " *Id.* at 579, 464 A.2d 1008. The original deed to the church property is to Babcock, without restriction. *Id.* Babcock's trustees subsequently transferred the property to a straw purchaser, who then transferred the property back to Babcock's trustees " 'in trust for the following uses and trust purposes and with the powers and subject to the limitations hereinafter set forth,' " including to " 'hold title to the property . . . for the use and benefit of the majority of the active communicant members of that congregation presently identified as the congregation of . . . [Babcock].' " *Id.* at 579–80, 464 A.2d 1008. Furthermore, § 62.12 of the "Book of Order"—United's constitution—provided that a local church shall not sell, mortgage, or encumber its property without the consent of the Presbytery. *Id.* at 580, 464 A.2d 1008.

After making the foregoing observations, the Court of Appeals explained this Court's reasoning in reversing the trial court. First, we recognized that United's polity is hierarchical, with its authority structure under the Book of Order arranged in ascending order as follows: (1) local Session, composed of local church elders and having authority over all local church affairs; (2) Presbytery, composed of all United churches in a geographic area; (3) Synod, composed of Presbyteries in a given state or region; and (4) General Assembly of United, the highest governing body within United. *Id.* at 582–83, 464 A.2d 1008. Next, we concluded from a section of the Book of Order that the local church session's authority as overseer of local property is " 'subject to a higher judiciary if The Book of Order extends that authority to the higher judiciary.' " *Id.* at 584, 464 A.2d 1008 (quoting *Presbytery of Baltimore of the United Presbyterian Church v. Babcock Memorial Presbyterian Church,* 52 Md.App. 428, 435, 449 A.2d 1190 (1982)). We then stated that the Book of Order did cloak the Presbytery with this superior authority, by virtue of various sections of the Book of Order, including § 62.12, and § 62.11, which provide that, whenever the Presbytery dissolves a local church or the local church becomes extinct, its property shall be held for such purposes as the Presbytery

may direct. *Id.* at 584–85, 464 A.2d 1008. Thus, we concluded that the local church's action with respect to its property is subject to the Presbytery's review. *Id.*

In agreeing with our holding, the Court of Appeals recognized that the significance of United's structure is that each local member church is subject to the rules and directions of its Presbytery, Synod, and General Assembly. *Id.* at 586, 464 A.2d 1008 (quoting *Lowe v. First Presbyterian Church of Forest Park*, 56 Ill.2d 404, 308 N.E.2d 801, 805 (1974)). The Court of Appeals further recognized that Babcock's bylaws specifically provided that the authority of Babcock's trustees to manage Babcock's property was subject to United's constitution. *Id.* at 587, 464 A.2d 1008. Babcock, therefore, "has recognized the authority and control of the higher judicatories of United." *Id.* Thus, according to the Court of Appeals, "by contract Babcock has adopted a presbyterial polity," and "the Court of Special Appeals did not err in its determination that Babcock is not a congregational church but the relationship is one that is hierarchical in nature. Accordingly, the Presbytery has an interest in this property." *Id.* at 588, 464 A.2d 1008.

Finally, the Court of Appeals explained that the *Eldership* analysis supports the conclusion that the Presbytery's rights to the property are superior to Babcock's. In this regard, *Babcock* recognized that in the *Eldership* cases the constitution of the parent church was silent "relative to control of local church property." *Id.* at 589, 464 A.2d 1008. In *Babcock,* however, United's constitution expressly provided that the local church's authority over local church property is subject to the authority of the parent church. *Id.* Additionally, the Court of Appeals recognized that validly passed bylaws of a local church must be obeyed. *Id.* The Court, therefore, relied heavily on the fact that "[t]he trustees of Babcock were bound by their by-laws to follow the established mandates of United." *Id.* Moreover, Babcock was without corporate power (none being granted by its charter) to dispose of its property. *Id.* at 590, 464 A.2d 1008. Before proceeding, it is appropriate to note, as the matter will become important

shortly, that there was not an explicit reverter upon withdrawal provision in any of the documents analyzed in *Babcock*.

In addition to the *Eldership* cases and *Babcock*, *Polen v. Cox*, 259 Md. 25, 267 A.2d 201 (1970), is a judicial decision worthy of mention. *Polen* involved a dispute over the control of local church property between the Church of God, a religious denomination, and a minister of a local member church. *Id.* at 27, 267 A.2d 201. In *Polen*, the trustees of the local church leased the church property to its minister, who subsequently formed a new religious corporation with four others. *Id.* at 28, 267 A.2d 201. The newly formed corporation held its services on the disputed property. *Id.* at 28, 267 A.2d 201. Thereafter, the Church of God officially revoked the minister's ministry in the Church of God, and filed suit for injunctive relief. *Id.* at 28–29, 267 A.2d 201. The chancellor concluded that the minister retained control of the property, but the Court of Appeals reversed that determination. *Id.* at 30, 267 A.2d 201.

In so doing, the Court of Appeals stated that "[a]n examination of the relevant documents reveal[s] that the Church of God is essentially a presbyterial hierarchical body." *Id.* at 34, 267 A.2d 201. The Church of God's "Minutes"—the basic governing and doctrinal laws of the Church of God—provide that the General Assembly of the Church of God has full power and authority to designate the practices of all local churches thereunder. *Id.* In addition, the Minutes provide that "'the right of any local church as a whole to withdraw from the General Assembly is not recognized and does not exist. . . .'" *Id.* In light of the provisions of the Minutes, the Court of Appeals stated, "We think this establishes clearly the hierarchical nature of the Church of God as autonomy of the local churches is virtually non-existent." *Id.*

Significantly, a provision of the Minutes specifically provided that in the event that a local church "depart[s] from the faith or decide[s] to discontinue fellowship with the organization, the state overseer shall have the power to appoint other trustees to hold the property for the Church of God." *Id.* at

35, 267 A.2d 201. Thus, the Court held that, in contrast to the *Eldership* cases, the Church of God determined that, when a local church departs from the national church, the property does not follow. "This is an example of a hierarchical church providing, 'in its constitution or by some authoritative source for the reverting of the local church property to the hierarchical body upon withdrawal by the local congregation with an implied consent by the local church to this provision.'" *Id.* at 36, 267 A.2d 201 (quoting *Eldership I,* 249 Md. at 663, 241 A.2d 691).

*Polen* then set out to determine "whether implied consent to these provisions of the Minutes can be inferred from the relationship between the mother church and the [local] congregation...." *Id.* The Court answered this question in the affirmative based on the "overwhelming evidence." *Id.* The evidence was that the minister was listed as an ordained Church of God minister; the Minutes also listed him as an overseer in the Church of God; the local church was listed as a member church in the Church of God; and the local church congregants were allowed to attend and vote upon matters before the General Assembly. *Id.* at 36–37, 267 A.2d 201. Furthermore, there was no evidence showing doctrinal differences between the local church and its parent. *Id.* at 37, 267 A.2d 201.

Significantly, the *Polen* court stated that

the [*Eldership* ] cases turned on the pivotal fact that the mother church failed to provide any rule or regulation regarding the disposition and control of local church property upon a withdrawal of the local congregation from the mother church. However, in the instant case the congregation of the local church once having impliedly consented to be bound by the Minutes of the mother church, cannot ignore the consequences attendant to withdrawing from that national body.

*Id.* at 38, 267 A.2d 201. Additionally, the Court noted that the local trustees held title to the land for the benefit and use of

the local church pursuant to the deeds. *Id.* at 38–39, 267 A.2d 201. Thus, the Court held:

> Reading [the trustees'] powers under the deed in conjunction with their power as trustees as defined in the Minutes, we can only conclude that once it was clear that a majority of the local church was going to discontinue fellowship with the Church of God, the lease of the property was beyond their power because it was not for the general use and benefit of the Church of God of Cambridge, Maryland.

*Id.* at 40, 267 A.2d 201. The Court, therefore, concluded that the local church was not entitled to keep the property after breaking from the Church of God. *Id.*

The above cases fairly demonstrate that in resolving church property disputes no one source is necessarily deserving of greater or lesser weight than any other particular source. *See, e.g., Calvary Presbyterian Church of Baltimore City v. Presbytery of Baltimore of the United Presbyterian Church in the United States of America,* 39 Md.App. 405, 418, 386 A.2d 357 (1978) (despite the fact that the deed conveyed the property to the local church corporation, this Court examined other sources in determining that the parent church controlled the property upon the local church's withdrawal). Indeed, those cases relied on various relevant materials in determining whether a local church may retain local property after splitting from its parent church.

Certainly, the required analysis is satisfied when the deeds for the local church property expressly provide that the property "is held in trust for the parent church in conformity to its worship, doctrine and discipline and, upon departure therefrom, the property will revert to the hierarchical body," or the General Assembly has enacted a statute providing for the same. *Eldership I,* 249 Md. at 663, 241 A.2d 691. Likewise, the analysis is satisfied when the parent church provides "in its constitution ... for the reverting of the local church property to the hierarchical body upon withdrawal by a local congregation with an implied consent by the local church to this provision." *Id.*

■ We do not believe, however, that the Court of Appeals in the *Eldership* cases intended these to represent the universe of methods by which a parent church may retain control of local property. In other words, the absence of an explicit reverter upon withdrawal clause does not necessarily mean that the local church is entitled to retain control of the property. Indeed, *Eldership I* recognized this by its statement that in "many hierarchical churches there may be provisions in ... controlling documents ... which make it clear that the property is held *in trust* for the uses of the parent church and its discipline and appointments." *Eldership I*, 249 Md. at 663, 241 A.2d 691 (emphasis added). Similarly, in *Babcock*, the parent church retained control of the local property, even though its constitution did not contain an explicit reverter upon withdrawal clause. *Babcock*, 296 Md. at 585, 589–90, 464 A.2d 1008.

Before applying the teachings of the foregoing cases to the facts of the instant dispute, we shall set forth the standard of our review.

### Standard of Review

■ MARYLAND RULE 2–501(a) (1995) permits a party to "file at any time a motion for summary judgment on all or part of an action on the ground that there is no genuine dispute as to any material fact and that the party is entitled to judgment as a matter of law." In reviewing a trial court's grant of summary judgment, an appellate court is required to determine whether the trial court's ruling was legally correct. *Nationwide Mut. Ins. Co. v. Scherr*, 101 Md.App. 690, 694, 647 A.2d 1297 (1994). This Court reviews the same material from the record and decides the same legal issues as the circuit court. *Id.* at 695, 647 A.2d 1297. In addition, this Court may hold that appellants are entitled to summary judgment, where the circuit court was legally incorrect in failing to grant appellants' motion for summary judgment. *See, e.g., Maryland Nat'l Bank v. Parkville Fed. Sav. Bank*, 105 Md.App. 611, 618, 660 A.2d 1043 (1995).

We have previously observed that summary judgment in a declaratory judgment action is the exception rather than the rule. *Id.* (citing *Loewenthal v. Security Ins. Co.*, 50 Md.App. 112, 117, 436 A.2d 493 (1981)). Summary judgment, however, is warranted in the instant case because the parties agree as to the terms of the relevant documents at issue in this case, but disagree regarding the proper interpretation of those terms. *Id.* Because the outcome of this dispute turns on the construction of disputed documentary language, rather than on the language itself, this is a proper question of law for this Court. *Id.* Our task on this review, therefore, is to construe the relevant documents to determine whether the circuit court was legally correct in its judgment.

## II

■ Turning to the merits of this appeal, appellants argue that the circuit court erred in determining that appellees are entitled to retain the property after seceding from the AME Church. They maintain that the circuit court should have determined, as a matter of law, that the Mt. Olive property was held in trust for the use of the pastors and members of the AME Church, and that, upon appellees' separation from the AME Church, appellees lost all rights with respect to the Mt. Olive property. In this regard, appellants' position on this appeal heavily relies on the fact that the AME Church is hierarchical, and on the terms of the 1894 certificate of incorporation of the Mt. Olive A.M.E. Church and the AME Church Discipline. Furthermore, appellants alternatively assert that summary judgment was improper because, at a minimum, genuine disputes of material fact existed as to whether appellants are entitled to own and control the property.

On the other hand, appellees argue that the circuit court properly applied the Maryland church property dispute analysis, and correctly granted summary judgement in their favor. Thus, appellees reject the argument that the hierarchical organization of the AME Church, along with the terms of the certificate of incorporation and the AME Church Discipline,

require the property to rest in the hands of appellants. Appellees' position is primarily based on the language of its deeds and on the fact that none of the relevant documents include an explicit provision requiring the properties to revert to the AME Church upon the local church's withdrawal from the AME Church.

We agree with appellants that the circuit court erred in granting summary judgment in appellees' favor. Moreover, the circuit court erred in failing to determine that appellees are not entitled to retain control of the property. Consequently, we shall reverse the circuit court's judgment. Our reasons for doing so are as follows.

Preliminarily, we observe that the trial court correctly determined that "[t]here is no question that the ... A.M.E. Church is a hierarchical church." Appellants convincingly explained in their brief that the general organizational structure of the AME Church is based on the hierarchical model. Appellees do not dispute this determination, although they strongly disagree that it is determinative of the outcome of this appeal. The record clearly indicates that there is no genuine dispute that the organizational structure of the AME Church is hierarchical. The *Eldership* cases clearly teach, however, that the analysis does not end there, because the fact that a denomination has characteristics of one type of polity does not mean that characteristics of other polities are excluded with respect to local church land. *Eldership I*, 249 Md. at 664, 241 A.2d 691. Rather, determining that a parent church is organized on a hierarchical basis is but one step in the required analysis.

As explained above, under the required analysis, a court must examine all relevant sources to determine whether the local church is entitled to retain control of the property following its break from the parent church. The *Eldership* line of cases demonstrates that those relevant sources include the parent church's constitution, the deed of the property in question, the local church's corporate charter, and the local church's internal bylaws, if any. In this case, the parties

bring to our attention the following: various versions of appellants' Discipline, the 1913 and 1975 deeds, and the 1894 certificate of incorporation.

The circuit court expressly relied on two such sources in granting summary judgment in appellees' favor: the deeds and a 1972 edition of the AME Church Discipline. As we mentioned in the above factual recital, there are two deeds involved in this case—a 1913 deed for the parsonage property and a 1975 deed for the sanctuary property, both designating Mt. Olive A.M.E. Church as the corporate grantee of the properties "in fee simple." Our review of these deeds indicates that neither deed contains a reverter provision whereby the property would revert to the AME Church upon the local church's separation from the AME Church. Nor is there any language remotely indicating such an intent. Indeed, the AME Church is not mentioned in these deeds. As previously noted, appellants agree that no such language is found in the deeds. Under the above-outlined case law, if the deeds were the only source for our consideration, therefore, we would be inclined to conclude that appellees retained the property upon their withdrawal. *See Eldership I*, 249 Md. at 665–66, 241 A.2d 691.[7] As shall be demonstrated below, however, appellees' reliance on the fact that the deeds indicate that the local church owns the property free and clear of the AME Church "is akin to standing on quicksand." *Calvary Presbyterian Church of Baltimore City*, 39 Md.App. at 418, 386 A.2d 357.

In addition, in granting summary judgment in appellees' favor, the circuit court relied on the 1972 Discipline. As we noted above, the Discipline is updated every four years. In their briefs, the parties refer to three editions of the Disci-

---

7. In a footnote of their brief, appellees cite cases from other jurisdictions for the proposition that "[s]ome courts have concluded that it is inappropriate to look beyond the language of deeds to extrinsic evidence of the local church's intent unless the deeds themselves are ambiguous." Consistent with our view that all relevant materials must be examined in this type of dispute, we do not believe that Maryland courts are precluded from looking beyond an unambiguous deed.

pline: 1888, 1972, and 1992.[8] Apparently under the impression that only the 1972 Discipline controlled, because this was the Discipline in effect at the time of the purchase of the sanctuary property in 1975, the trial judge ruled from the bench as follows:

The 1972 Discipline that was in effect at the time of the acquisition of the property, of the principal piece of property involved in this proceeding [i.e., the sanctuary property], upon my review of it, has no provisions for the property being held in trust or any reversion or anything of that nature.

It does provide for a form of deed to be used if the property is to be transferred in trust for the principle corporation, a form of deed that was not used in the instant case, a form of deed that was not used in the original acquisition of property back in the 1890's.

The Court believes in applying neutral principles of law that the property was conveyed to the local church trustees, to the religious corporation, and that it is owned by the religious corporation, and that they are entitled to the control of the property.

The "form of deed" to which the circuit court was referring is a form deed contained in the 1972 Discipline. A provision of the "General Church Property" section of the 1972 Discipline provides that the form deed should "be brought into effect in all possible cases wherever the law will permit it in a State," and that, "[i]f necessary, each Annual Conference may make such modifications in the [form] deed as may be required by the laws of any State so as to firmly, [sic] secure the premises to the African Methodist Episcopal Church." The form deed contained in the 1972 Discipline employs language clearly indicating that the grantee trustees shall take the property in trust for the "members of the [AME Church] in the United States of America, according to the rules and Discipline of said

---

8. In addition, the record contains an excerpt from an 1864 version of the Discipline. The parties do not argue on this appeal that any provisions of this version apply in this case.

Church, which from time to time may be adopted and agreed upon by the ministers and preachers of the said Church, at their General Conference in the United States of America. . . ." The trial court correctly noted that the form deed was not employed in this case.

Assuming without deciding that the circuit court was correct in determining that the 1972 Discipline "has no provisions for the property being held in trust or any reversion or anything of that nature," the circuit court nonetheless incorrectly determined that appellees "are entitled to the control of the property." This is because the circuit court failed to recognize the controlling implications of the 1894 certificate of incorporation of the Mt. Olive A.M.E. Church. Under the certificate of incorporation, appellees are not entitled to retain control of the property after departing from the AME denomination, even if the 1972 Discipline is silent on the issue. We explain.

The 1894 certificate of incorporation for the Mt. Olive A.M.E. Church, reads, in pertinent part:

Know all men by these presents,

That the members of the African Methodist Episcopal Church situated at Fruitland Wicomico County State of Maryland . . . at the church building known as Mount Olive on the thirteenth day of April Eighteen hundred and ninety four . . . then and there resolve to organize and constitute themselves as a body politic or corporate and for that purpose elected Ebin Stanford, William Cornish, William Cotman, Nathaniel Stanford, S.C. Butler and Ephraim Banks as Trustees in the name and on behalf of the said Mount Olive African Methodist Episcopal Church and congregation under the provisions of the Public General laws of Maryland and at the said meeting adopted the following regulations, to Wit:

\* \* \* \* \* \*

4th The name of this Corporation shall be Mount Olive African Methodist Episcopal Church of Fruitland and the congregation Mount Olive.

5th The powers and authority of said Trustees shall be in subjection to the discipline of said church, and the property held by them in trust for the use of the ministry and membership of said church as a place of worship and as a parsonage or dwelling house for the preacher subject to the ministerial appointment of the proper authorities in said church.

There is considerable disagreement regarding the proper interpretation of this document. Appellants argue that the language of paragraph 5 "obliged the trustees of Mt. Olive A.M.E. Church to hold all property in trust for the AME Church as a denomination...." Appellees, on the other hand, disagree that the language of paragraph 5 operates in that manner. They assert that "said church" refers to the local church, "Mount Olive African Methodist Episcopal Church of Fruitland,"—not the parent AME Church—because the only church allegedly mentioned in the certificate of incorporation is the "Mount Olive African Methodist Episcopal Church of Fruitland."

Focusing on paragraph 5's language "in subjection to the discipline of said church," appellants retort that "said church" must be referring to the AME Church denomination because "[t]here is simply no such thing as a *local* 'discipline' of any AME congregation," whereas the AME Church Discipline is well known and pre-dates the local church's incorporation. Furthermore, focusing on the language "in trust for the use of the ministry and membership of said church as a place of worship and as a parsonage or dwelling house for the preacher subject to the *ministerial appointment of the proper authorities in said church,*" appellants assert that "said church" must mean the AME Church denomination because in the AME system local churches have no power to make a "ministerial appointment," as this power is reserved for Bishops in the hierarchy. (Emphasis added).

Viewing the certificate of incorporation as similar to a contractual document, we observe that "[c]onstruction of a contract is, in the first instance, a question of law for the court to resolve." *Shapiro v. Massengill,* 105 Md.App. 743, 754, 661

A.2d 202 (1995). Where contractual language is plain and unambiguous, there is no room for construction. *Id.* If the language is ambiguous, however, "the meaning of the contract is a matter for the trier of fact to resolve." *Id.* at 754–55, 661 A.2d 202. "An ambiguity exists when, to a reasonably prudent person, the language used in the contract is susceptible of more than one meaning." *Heat & Power Corp. v. Air Products & Chemicals, Inc.*, 320 Md. 584, 596, 578 A.2d 1202 (1990). Where resolution of the ambiguity depends on disputed factual issues, an issue exists for the fact finder. *Truck Ins. Exch. v. Marks Rentals, Inc.*, 288 Md. 428, 433, 418 A.2d 1187 (1980). Where, however, there is not a real dispute as to the facts pertinent to resolve the ambiguity, construction is for the court. *Id.*

In the instant case, there is no real dispute as to the facts that are pertinent to the question of whether, by virtue of the certificate, the local church trustees owned the property in trust for the AME Church and subject to the AME Church Discipline. The record is clear that there is only one "discipline"—that of the AME Church. Appellees have not introduced a separate "discipline" governing their local congregation. Nor have they disputed that the term "discipline" means anything other than the AME Church's governing constitution, as appellants argue. Additionally, it is undisputed that the only "proper authorities" with the power of making a "ministerial appointment" are found in the AME hierarchy. In this regard, during the hearing before the circuit court, appellees' counsel made it clear to the circuit court that there was no dispute that the local church accepted the pastors and ministers appointed by the AME Church. Because there is no dispute of fact pertinent to the resolution of this ambiguity, the onus of construing the certificate of incorporation is upon this Court.

Preliminarily, we observe that the meaning of paragraph 5 of the certificate of incorporation is by no means readily apparent. As is demonstrated by the very different interpretations of the parties, it is no easy task to construe paragraph 5. Nonetheless, in the final analysis, we must hold that

appellants are correct that paragraph 5 of the certificate of incorporation subjected the trustees to the AME Discipline and caused the local church property to be held in trust for the AME Church. We agree with appellant that this is the only reasonable construction of the certificate of incorporation in light of the undisputed facts that the only "discipline" is that of the AME Church, and that only the AME Church—not local AME member churches—has the power to appoint pastors.

Furthermore, we do not entirely agree that it is beyond cavil that the "Mount Olive African Methodist Episcopal Church of Fruitland," is the only church mentioned in the certificate, and that, therefore, the term "said church" necessarily refers thereto. As we set forth above, the opening sentence of the certificate reads, in pertinent part: "Know all men by these presents ... That the members of the African Methodist Episcopal Church *situated at* Fruitland Wicomico County State of Maryland ... resolve to organize and constitute themselves as a body politic or corporate...." (Emphasis added). This portion of the certificate reasonably implies that the AME Church, as opposed to the local church, is the church being referred to in the certificate. In addition, this portion of the certificate clearly indicates that the "members" consider themselves members of the AME Church. Also, the use of the phrase "situated at" reasonably imports a geographic-descriptive meaning, rather than a limiting meaning. Whether "said church" plainly refers to the "Mount Olive African Methodist Episcopal Church of Fruitland," therefore, is not entirely clear.

All of this said, however, we acknowledge that, from a cursory reading of the certificate, it can be argued that "said church" is not the AME Church, but is the local church. If this is the case, however, paragraph 5 becomes utterly confusing in light of the fact that local AME churches do not have their own disciplines and do not appoint preachers. We shall not adopt a construction that has this effect. *See Born v. Hammond,* 218 Md. 184, 188, 146 A.2d 44 (1958) (where a contract is susceptible of two constructions, one of which

produces an absurd result and the other of which carries out the purpose of the agreement, the latter construction should prevail). In this regard, we are mindful of the well-settled principle that ambiguous terms are to be construed against the drafter—in this case, the local church. *See, e.g., Truck Ins. Exch.*, 288 Md. at 435, 418 A.2d 1187 (ambiguous contracts are construed against the drafter absent evidence of intent).

Accordingly, our construction of the certificate of incorporation has two results: (1) the "powers and authority of said Trustees" are "in subjection" to the AME Church Discipline; and (2) the property must be "held by them in trust for the use of the ministry and membership" of the AME Church. Under the first, appellants argue that the Mt. Olive property is property subject to the provision in the 1972 Discipline stating that the trustees "shall guard all the real estate, churches, parsonages, school houses and other property owned by the people in the connection." According to appellants, this means that the local church could not retain control of the local property upon withdrawing from the AME Church. Appellees disagree, arguing that this provision in the 1972 Discipline is not a provision explicitly providing for the reversion of local property to the AME Church upon a local church's withdrawal from the AME Church. As we shall explain below, because of our view respecting the second result, we may assume, without deciding, that appellees are correct that the 1972 Discipline is silent on the issue.

Based exclusively on the language in the certificate requiring that the trustees hold the property "in trust" for the AME Church, we hold that appellees were not entitled to retain control of the land after their departure from the AME Church. Appellees disagree, arguing that "[e]ven assuming *arguendo* that this language created a trust in favor of the [AME Church] ... such generalized trust language by itself does not and cannot substitute for an explicit reverter upon withdrawal provision." In this regard, appellees contend that there must be explicit language providing unequivocally that the AME Church will take ownership of the local property

upon a local church's withdrawal. To support this contention, appellees cite *Eldership I*, 249 Md. at 665–68, 241 A.2d 691, wherein the Court of Appeals stated that a deed provision providing for the reversion of the property in the event the local church becomes extinct or ceases to function is not equivalent to a reversion upon withdrawal provision. Appellees also remind us that "the [*Eldership*] cases turned on the pivotal fact that the mother church failed to provide any rule or regulation regarding the disposition and control of local church property upon a withdrawal of the local congregation from the mother church." *Polen*, 259 Md. at 38, 267 A.2d 201.

We reject appellees' assertion that in order for a parent church to retain control of local church property there invariably must be an explicit reverter upon withdrawal provision. In *Babcock*, the Court of Appeals noted that, as in contrast to the *Eldership* cases, there was a "provision relative to *control* of local church property by the parent church." *Babcock*, 296 Md. at 589, 464 A.2d 1008 (emphasis added). Our analysis of that provision indicates that it was not an explicit reverter upon withdrawal provision. Section 62.12 of the parent church's constitution "relative to *control* of local church property" provided that a local church was forbidden from selling, mortgaging, or otherwise encumbering its property without the parent church's written permission. *Id.* (emphasis added).[9] It is readily apparent that this is merely a general provision relating to control of local property—not an explicit reverter upon withdrawal provision. This provision precluded the local church from giving away its property, as the local church was bound by its bylaws specifically requiring it to follow the mandates of the parent church. *Id.* Moreover, under the principle that "a corporation has only such powers as are expressly granted by its charter or by statute and such as may impliedly be derived from its corporate purposes," the local church was not granted power by its charter to dispose of its property by gift. *Id.* at 590, 464 A.2d 1008.

---

9. Likewise, § 62.11 (discussed above) is not an explicit reversion upon withdrawal provision.

Therefore, although we acknowledge that the certificate of incorporation does not contain an explicit reverter upon withdrawal provision, we find that in this case the requirement therein that the local church trustees must hold the local property "in trust" for the AME Church has the same effect and is tantamount to an explicit reverter provision. BLACK'S LAW DICTIONARY 1508 (6th ed. 1990) defines "trust" as "[a] confidence reposed in one person, who is termed trustee, for the benefit of another, who is called the cestui que trust, respecting property which is held by the trustee for the benefit of the cestui que trust." The trustee, therefore, has a duty of loyalty barring him from "acting in the interest of third parties at the expense of the beneficiaries." *Board of Trustees v. Mayor & City Council of Baltimore,* 317 Md. 72, 109, 562 A.2d 720 (1989). Indeed, it is firmly established that a trustee has a duty of loyalty to the beneficiaries precluding the trustee from using the trust property for his personal purposes. *Gianakos v. Magiros,* 238 Md. 178, 185–86, 208 A.2d 718 (1965). Furthermore, upon the trustee's death, the trust property does not pass to the trustee's estate, but remains for the benefit of the beneficiary because the trustee holds it in trust for the beneficiary should the trustee outlive the beneficiary. *See Barker v. Aiello,* 84 Md.App. 629, 632 n. 1, 581 A.2d 462 (1990).

Thus, under *Babcock,* appellees were bound by the certificate of incorporation. As a result, the local church trustees were duty bound, under the above principles of trust law, to hold the property for the interests of the AME Church, without regard to the interests of third parties. This duty of loyalty precluded them from allowing the local congregation to retain control of the property following the congregation's withdrawal from the AME Church. Rather, the local trustees had a duty to ensure that the property remained for the use and benefit of the membership of the AME Church—the beneficiary. In the same manner that trust property remains for the benefit of the beneficiary upon the death of the trustees, so too did the Mt. Olive property remain for the benefit of the AME Church upon the decision of the trustees

and the other local church members and officers to withdraw from the AME Church. There can be no doubt that a trustee, upon his resignation from his official duties of guarding the trust property, is not entitled to take the property with him or otherwise allow the property to fall into the hands of third parties. The trustees in this case were equally constrained.

In other words, in light of the trustees' powers under the above-general principles of trust law pursuant to the certificate of incorporation, we conclude that once the local members chose to discontinue fellowship with the AME Church, the trustees were without power to allow the departing members to retain control of the property because that was not for the benefit of the membership of the Mt. Olive A.M.E. Church, i.e., the members of the AME Church "situated at" Fruitland. *See Polen*, 259 Md. at 40, 267 A.2d 201 ("Reading [the trustees'] powers under the deed in conjunction with their power as trustees as defined in the Minutes, we can only conclude that once it was clear that a majority of the local church was going to discontinue fellowship with the Church of God, the lease of the property was beyond their power because it was not for the general use and benefit of the Church of God of Cambridge, Maryland."). Accordingly, although there may be no explicit reverter upon withdrawal provision in this case, we are satisfied that the trust provision in the certificate of incorporation had the same effect.

Our reliance on the certificate of incorporation in this regard is wholly justified. Apart from the principle that a local church is bound by its own rules and regulations under *Babcock*, we observe that the certificate of incorporation predates the purchase of the properties in this case, and that for over one hundred years the certificate of incorporation remained unchanged, the local church failing to amend the document. In light of these facts, we are convinced that the terms of the certificate sufficiently demonstrate that the incorporators of the local church originally contemplated and intended that the local church property should be subject to the AME Church's control.

As a result, we may assume, as appellees argue, that the language in the 1972 Discipline is silent on the issue. For that matter, we may also assume that the 1992 Discipline is similarly silent.[10] Thus, we agree with appellants that, apart from the AME Church Discipline, the certificate of incorporation, standing alone, created a trust relationship between the parent church and the local church, whereby the local property was held in trust for the benefit of the former.

We therefore hold that the trial court incorrectly failed to construe the 1894 certificate of incorporation to preclude appellees from maintaining control over the local church property. In this regard, the trial court erred in granting summary judgment in favor of appellees, and erred in declaring in

---

**10.** Appellees argue that they were not bound by the 1992 Discipline because it was enacted after the acquisition of the properties in question, and because the local church did not consent to the new terms therein, although they contend that even under that version they are entitled to retain ownership of the property.

The 1992 Discipline, like the 1972 Discipline before it, contains a similar "Duties of Trustees" section. The 1992 Discipline, however, contains a much more detailed discussion of local church property. For example under the "General Church Property" section, all local church property is held in trust for the AME Church. This section further provides that the absence of a trust clause "shall not exclude a local church from ... its Connectional character and responsibilities to the [AME Church]...." In addition, the trustees may purchase, mortgage, sell, transfer, and convey real and personal property with proper approval from within the AME Church hierarchy. As in the 1972 Discipline, the 1992 Discipline contains a "Form of Deed." The form deed makes clear that the local church acquiring the land "is a local church of the [AME Church] ... and is therefore subject to the General Conference of the [AME Church] ... all in accordance with ... the latest edition of the *Book of Discipline* of the [AME Church]." Furthermore, in a deed for local church property "[t]he following language ... must be included in the Deed":

> To have and to hold, In Trust, the aforesaid land ... that said premises shall be used, kept, and maintained as a place of divine worship for the use of the ministry and membership of the [AME Church], subject to the *Discipline*, usage, and ministerial appointments of said church, .... It is provided, however, that no pastor, no trustee board shall mortgage or sell any property of the [AME Church], without the written consent of the Bishop of the episcopal district and the Annual Conference where the property shall be located.

its Order for Declaratory Relief that the subject property is the sole and exclusive property of the local church, free and clear from any interests of the AME Church. The trial court should have determined that legal title to the Mt. Olive property is held by those trustees of the Mt. Olive A.M.E. Church who remained affiliated with the AME Church, in trust for the AME Church. Remand, therefore, is necessary for the circuit court to enter judgment in appellants' favor in this regard. Furthermore, as appellants request, we remand this case to the circuit court for an order enjoining appellees from interfering with appellant's right to own, possess, and control the Mt. Olive property.

**JUDGMENTS OF THE CIRCUIT COURT FOR WICOMICO COUNTY REVERSED AND REMANDED FOR ENTRY OF JUDGMENT CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY APPELLEES.**